123 P.3d 1156

**C. Bingham DAVIS and Robin Muller Davis, Plaintiffs/Appellees Cross Appellants,**

v.

**Emil ZLATOS and Gertrude Zlatos, husband and wife; Myrna L. Cagney, Attorney–In–Fact for Gertrude Zlatos; Richard W. Morris and Jane Doe Morris, husband and wife, Defendants/Appellants Cross Appellees.**

**Emil Zlatos and Gertrude Zlatos, husband and wife, Plaintiffs/Appellants Cross Appellees,**

v.

**Pete Tanguma Saenz, Sr. and Teresa D. Saenz, husband and wife; C. Bingham Davis and Robin Muller Davis, Defendants/Appellees Cross Appellants.**

**No. 1 CA–CV 04–0413.**

Court of Appeals of Arizona, Division 1, Department E.

Dec. 6, 2005.

The Cavanagh Law Firm, P.A. By Christopher Robbins, Phoenix, Attorneys for Zlatoses, Cagney and Morrises.

Mariscal, Weeks, McIntyre & Friedlander, P.A. By Timothy J. Thomason and Michael J. Plati, Phoenix, Attorneys for C. Bingham Davis and Robin Muller Davis.

**OPINION**

IRVINE, Judge.

¶ 1 Appellants seek to overturn the trial court's judgment that Pete Tanguma Saenz ("Saenz") did not violate Arizona's Adult Protective Services Act, Arizona Revised Statutes ("A.R.S.") sections 46–451 through 46–457 (2005)[1] (the "APSA"), in obtaining money and title to a parcel of property from Gertrude Zlatos and quieting title to the property in favor of Appellees, C. Bingham

Davis and Robin Muller Davis ("the Davises"). Because we find that Mrs. Zlatos was a vulnerable adult under the APSA and that Saenz, as the Davises' predecessor in interest, did not act for her benefit to the same extent as a trustee, we reverse.[2]

**FACTS AND PROCEDURAL HISTORY**

¶ 2 Mr. and Mrs. Zlatos[3] were born in 1908 and 1913, respectively, and were married in 1932. By 1980, the Zlatoses had relocated to Arizona. The couple's daughter, Myrna Cagney, resides in Houston, Texas.

¶ 3 During their marriage, Mr. Zlatos handled all of the couple's finances. On July 11, 1991, the Zlatoses created a living trust naming themselves as trustees and authorizing either, acting alone, to transfer real or personal property of the trust. The Zlatoses then transferred title of some real property they owned in Sun City (the "Property") to the trust.

¶ 4 In 1993 Mr. Zlatos's health began to deteriorate. At about this time, Saenz started performing cleaning services for the couple. Over the years, Saenz began performing additional tasks, such as errands, cooking, and transportation services, and by 1999 was employed full-time for the Zlatoses. Saenz also performed some tasks for Mr. Zlatos's sister. In December 1999, Mr. Zlatos was hospitalized and in January 2000 he was placed in a lockdown Alzheimer's wing of Grandview Health Center ("Grandview").

¶ 5 The Zlatoses' son-in-law, Dale Cagney, testified that he had discovered several years before Mr. Zlatos was hospitalized that the Zlatoses' tax returns had not been filed for several years. The Cagneys acted to bring the couple's taxes up to date, filing the taxes and paying the penalties, fines, and interest. After this, in approximately 1998, the Cagneys took over the Zlatoses' bills, cancelled

---

1. The decision refers to the current version of the statute, which is essentially the same as that in effect at the relevant time.

2. Pursuant to Rule 28(g), Arizona Rules of Civil Appellate Procedure, we address and reject in a separate memorandum decision the Davises' cross-appeal from the trial court's finding that they had constructive notice of Appellants' claim upon the property and, therefore, were not bona fide purchasers for value. On that issue, we affirm the trial court.

3. Mr. Zlatos passed away on October 9, 2002. Mrs. Zlatos was alive during trial but has since died.

many of their credit cards, had their mail forwarded to the Cagneys' home in Houston, and arranged for many of their utilities to be paid by direct withdrawal.

¶ 6 On a number of occasions in the late 1990s, Mr. Zlatos became lost and Saenz had to find him. During 1999 Mrs. Zlatos also fell several times. On one occasion Saenz was not at work but became concerned when the Zlatoses did not answer the telephone. When he stopped at the house he found Mrs. Zlatos had fallen in the bedroom four to five hours earlier and had not been able to get up.

¶ 7 In December 1999, following Mr. Zlatos's hospitalization, Dale Cagney told Saenz that Mrs. Zlatos needed two caretakers to provide companionship and care twelve hours a day. Saenz recruited the help of his daughter and the two provided Mrs. Zlatos with care for more than twelve hours a day, seven days a week. Saenz was paid $500 dollars a week and his daughter received comparable compensation. As part of his duties Saenz transported Mrs. Zlatos to Grandview every afternoon so she could have dinner with her husband. With regards to Mrs. Zlatos's daily expenses, the record shows that Saenz would routinely cash checks for her at the bank and purchase her necessities such as groceries, toiletries, medical equipment, and other medical supplies.

¶ 8 In early 2000, Mrs. Zlatos began writing a series of large checks to Saenz. On February 3, 2000, Mrs. Zlatos wrote Saenz a check for $6,000. According to Saenz,[4] he was having difficulty with his car and Mrs. Zlatos loaned him the money to buy another car because she was concerned about him arriving to work on time. Five days later Mrs. Zlatos wrote a check to Saenz for $900 that Saenz later believed was a loan for his son's college tuition. On April 6, 2000, Mrs. Zlatos wrote Saenz another check for $6,000, as a loan, to buy a car for his wife, who was left all day without a car while he was with Mrs. Zlatos. On May 23, 2000, Mrs. Zlatos wrote Saenz a check for $1,500, with the notation "loan" written on the check. On June 5, 2000, Mrs. Zlatos wrote Saenz a check for $5,500, as a loan, which helped pay for Saenz's mother-in-law's funeral expenses. On June 16, 2000, a check was issued to Saenz for $3,500 as a loan to help pay medical bills for Saenz's wife. Thus, from February to June 2000, payments labeled "loans" totaling $23,400 were made to Saenz. Saenz did not sign a promissory note for the loans and the loans did not have interest due. At trial, Saenz testified that sometime in February or March, 2000, Mrs. Zlatos told him: "You don't need to pay me back. I just want to make sure that you're here." Even after this conversation, Mrs. Zlatos continued to write "loan" on the bottom of the checks.

¶ 9 In February 2000, Mrs. Zlatos told Saenz that she wanted to transfer the Property to him as a birthday gift. Mrs. Zlatos contacted Fidelity National Title Insurance Company ("Fidelity") and opened an escrow account on February 24, 2000. Fidelity's escrow agent Alicia Varela handled the transaction and prepared the appropriate transfer documents. On or about March 13, 2000, Varela and Saenz traveled to Mrs. Zlatos's home. Varela explained the documents and Mrs. Zlatos signed a warranty deed, on behalf of herself and Mr. Zlatos, conveying the Property to Saenz. Varela, along with Saenz, then traveled to Grandview and had Mr. Zlatos sign a specific power of attorney authorizing Mrs. Zlatos to sign for him. On March 14, 2000, Saenz recorded the Warranty Deed taking title to the Property.

¶ 10 In June 2000, the Cagneys discovered that Mrs. Zlatos had made the loans to Saenz, and later learned of the transfer of the Property. In June 2000, Mrs. Zlatos was examined by Dr. Amardeep Majhail who testified at trial that he had found that she was very frail and elderly, and had some breathing trouble. In July 2000, Mrs. Zlatos was placed in Grandview with her husband and Saenz's employment was terminated by Mr. Cagney. In November 2000, Mrs. Zlatos was diagnosed with mild to moderate Alzheimer's dementia. Dr. Majhail testified that she "probably" had dementia in March

---

**4.** Mrs. Zlatos did not testify at trial and the stated facts concerning her statements to Saenz are based on his testimony.

2000 because once a patient is diagnosed she may have had it for at least a couple of months or a year.

¶ 11 On or about November 28, 2000, the Zlatoses, through Mrs. Cagney, demanded that Saenz return the money and Property. Saenz refused. In January 2001, the Cagneys contacted the Maricopa County Sheriff's Department. A deputy questioned Saenz regarding alleged elder abuse but no charges were ever brought against Saenz. During this interview Mr. Saenz indicated to the deputy that the checks "were for a loan. And he was going to pay those back. And there was some type of arrangement that they were going to be paid back."

¶ 12 On January 10, 2001, the Zlatoses, through Mrs. Cagney, recorded a Notice of Claim of Interest with the Maricopa County Recorder giving notice that the Warranty Deed to Saenz, dated March 10, 2000, and recorded on March 14, 2000, was not properly obtained and such deed was void.

¶ 13 On January 7, 2002, the Zlatoses and Cagney filed a complaint against Saenz. The complaint alleged that Saenz breached his fiduciary duties to the Zlatoses by knowingly depriving an incapacitated or vulnerable adult of his or her assets or property in violation of the APSA and requested that title to the land be quieted to the Zlatoses. On March 4, 2002, Saenz sold the Property to the Davises for $20,000. On September 5, 2002, the Zlatoses, through Mrs. Cagney, recorded a Notice of Lis Pendens.

¶ 14 On December 2, 2002, the Davises filed a separate lawsuit claiming that they were the true owners of the Property and requesting that the trial court clear title to the Property. The Zlatoses then filed an amended complaint adding the Davises as defendants, alleging that the Davises had constructive notice of Mrs. Zlatos's interest in the Property and requesting that the trial court quiet title to the Zlatoses. The trial court subsequently consolidated the two actions.

¶ 15 A two-day non-jury trial was held after which the trial court issued a minute entry adopting the parties' joint pretrial statement of facts and setting forth findings of fact. Specific findings included: Saenz was in a position of trust and confidence with Mr. and Mrs. Zlatos at all relevant times; at all times Mr. Zlatos was incapacitated; none of the loans had been fully repaid, but all were eventually forgiven by Mrs. Zlatos; Mrs. Zlatos did not require assisted living until July 2000; and Mrs. Zlatos had frequent opportunities to raise concerns with others if she believed that Saenz was acting inappropriately, but did not do so. The trial court concluded that the Zlatoses had not met their burden to establish (1) that Mrs. Zlatos was an incapacitated or vulnerable adult under the statute during the time that the transactions at issue took place, (2) that the March 2000 transfer of the Property to Saenz was invalid pursuant to A.R.S. § 46–456(A), (3) that Saenz knowingly obtained control, title, use, or management of the property by intimidation or deception with any unlawful intent under § 46–456(B) and (4) that funds were obtained from an incapacitated or vulnerable adult in an unlawful manner. The trial court ordered judgment in favor of Saenz and quieted title to the Property in favor of the Davises. Final judgment was entered on November 5, 2003.

¶ 16 The Zlatoses' motion for reconsideration and motion for a new trial were denied. The Zlatoses appeal. Saenz and his wife have not appeared in this appeal.

## DISCUSSION

¶ 17 On appeal the Appellants claim that the trial court erred by finding (1) that Mrs. Zlatos was not a vulnerable or incapacitated adult for purposes of the APSA, (2) that Saenz did not knowingly take control, title, use or management of the Property or assets by use of intimidation or deception, (3) that Saenz did not acquire the Property in violation of A.R.S. § 46–456(A), and (4) that the trial court erred by quieting title to the Property in favor of the Davises.

¶ 18 The trial court made several findings of fact in its minute entry filed September 10, 2003 and adopted the parties' uncontested facts from the joint pretrial statement. Generally, a trial court's factual findings must be accepted on appeal unless they are "clearly erroneous." *In re United States Currency*

*in the Amount of $26,980.00,* 199 Ariz. 291, 295, ¶ 9, 18 P.3d 85, 89 (App.2000). Factual findings "are not clearly erroneous if substantial evidence supports them," and "[s]ubstantial evidence is evidence which would permit a reasonable person to reach the trial court's result." *Id.* "However, where facts are not in dispute and where the trial court's findings of fact are in many respects conclusions of law, this court is not bound by them." *Globe Am. Cas. Co. v. Lyons,* 131 Ariz. 337, 343, 641 P.2d 251, 257 (App.1981); *see also Broemmer v. Abortion Servs. of Phoenix, Ltd.,* 173 Ariz. 148, 150, 840 P.2d 1013, 1015 (1992) ("When the facts are undisputed, this court is not bound by the trial court's conclusions and may make its own analysis of the facts or legal instruments on which the case turns.").

¶ 19 In 1988, the legislature determined that elder abuse in Arizona was a serious problem justifying legislative intervention and enacted the APSA, which criminalized abuse of an incapacitated or vulnerable adult, designating elder abuse a class 5 felony. *Denton v. Superior Court,* 190 Ariz. 152, 155, 945 P.2d 1283, 1286 (1997) ("The legislature's intent and the policy behind the elder abuse statute are clear. Arizona has a substantial population of elderly people, and the legislature was concerned about elder · abuse."). The next year the legislature amended the statute to create a statutory civil cause of action for elder abuse. *Id.* at 156, 945 P.2d at 1287. The Arizona Supreme Court has interpreted the statute in two cases and each time held that the intent of the legislature was to provide the elderly population in Arizona greater protection under the APSA than already provided under other civil remedies. *Estate of McGill v. Albrecht,* 203 Ariz. 525, 528, ¶ 6, 57 P.3d 384, 387 (2002) (holding APSA not limited by any other civil remedy); *Denton,* 190 Ariz. at 155, 945 P.2d at 1286 (holding elder abuse victims may recover damages for pain and suffering endured notwithstanding the death of the victim).

5. Arizona Revised Statutes § 46–456(G)(3) defines "position of trust and confidence" to mean that a person is any one of the following:
    (a) One who has assumed a duty to provide care to the incapacitated or vulnerable adult.

¶ 20 Under the APSA, civil liability with damages of up to three times the amount of the monetary damages may be established under either A.R.S. § 46–456(A) or (B), or both. A.R.S. § 46–456(C). The burden of proof is a preponderance of the evidence. A.R.S. §§ 46–455(L), –456(E). Subsection A requires that a person "in a position of trust and confidence to an incapacitated or vulnerable adult shall act for the benefit of that person to the same extent as a trustee pursuant to title 14, chapter 7, article 3 [Section 14–7301 et seq.]." A.R.S. § 46–456(A). Under subsection B, criminal and civil liability exists if a "person who is in a position of trust and confidence and who by intimidation or deception knowingly takes control, title, use or management of an incapacitated or vulnerable adult's asset or property with the intent to permanently deprive that person of the asset or property." A.R.S. § 46–456(B). The common threshold elements of the two subsections are "a position of trust and confidence" with "an incapacitated or vulnerable adult." In this case, the trial court specifically found that Saenz was in a position of trust and confidence [5] with Mrs. Zlatos, so the central issue on appeal is whether Mrs. Zlatos was incapacitated or vulnerable.

¶ 21 "Incapacity" and "vulnerable" are defined in the APSA.

5. "Incapacity" means an impairment by reason of mental illness, mental deficiency, mental disorder, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication or other cause to the extent that the person lacks sufficient understanding or capacity to make or communicate informed decisions concerning his person.

. . . .

10. "Vulnerable adult" means an individual who is over eighteen years of age or older who is unable to protect himself from abuse, neglect or exploitation by others

(b) A joint tenant or a tenant in common with an incapacitated or vulnerable adult.
(c) One who is in a fiduciary relationship with an incapacitated or vulnerable adult including a de facto guardian or de facto conservator.

because of a physical or mental impairment.

A.R.S. § 46–451(A)(5) and (10).

¶ 22 The trial court found that "[i]t [was] extremely difficult to determine at what point Mrs. Zlatos became incapacitated and vulnerable, but Plaintiffs [had] not met their burden to demonstrate incapacity or vulnerability prior to the real estate transaction in question occurring in March 2000." The Davises argue that this finding is conclusive because it is supported by substantial evidence. Appellants respond that the finding is not binding on appeal because "other than one or two vague generalizations [the Davises] cannot cite to any evidence in the record to support the trial court's finding." In essence, Appellants argue that the trial court's conclusion that Mrs. Zlatos was not "incapacitated or vulnerable" was a legal conclusion unsupported by the trial court's specific factual findings, some of which were themselves unsupported by the record. With regard to the trial court's conclusion that Mrs. Zlatos was not a "vulnerable adult" for purposes of the APSA, we agree with Appellants. The trial court's general finding on this issue was in many respects a conclusion of law, and this court is not bound by it.

¶ 23 Most of the trial court's specific findings addressed only Mrs. Zlatos's mental capacity to understand the nature of her actions. Because we conclude below that Mrs. Zlatos met the definition of a vulnerable adult, we need not address whether the evidence was sufficient to find Mrs. Zlatos was also incapacitated. To apply the APSA to Mrs. Zlatos it is only necessary to find that she was either incapacitated *or* vulnerable. Although a person may be both, *see McGill,* 203 Ariz. at 528, ¶¶ 5–6, 57 P.3d at 387 ("Ms. McGill, of course, fits either definition, and APSA clearly covers her."), the terms are not equivalent and address distinct dangers to the elderly. An incapacitated person cannot make informed decisions. A vulnerable person may be able to make such decisions, but is unable to protect herself against being abused, neglected or exploited. The protections of the statute extend to a vulnerable adult even if the person is not incapacitated.

¶ 24 The first step in our analysis of the statutory definition of "vulnerable adult" is to consider whether Mrs. Zlatos suffered from an "impairment." The APSA does not define "impairment," so we apply the ordinary meaning of the word. *Mid Kansas Fed. Sav. & Loan v. Dynamic Dev. Corp.,* 167 Ariz. 122, 128, 804 P.2d 1310, 1316 (1991). An "impairment" is something that causes a "decrease in strength, value, amount, or quality." Websters II, New College Dictionary 553 (Houghton Mifflin Co.2001). Other definitions have defined impairment in terms of injury, deterioration, or lessening. Webster's Third New International Dictionary 1131 (Unabridged 1993); *see also* Oxford English Dictionary (Compact Ed.1971) ("deterioration; injurious lessening or weakening").

¶ 25 The trial court made no specific findings as to whether Mrs. Zlatos was physically impaired. The nearest it came to doing so was its finding that Mrs. Zlatos did not require assisted living until July 2000. We conclude that this finding is clearly erroneous because it is not supported by the evidence. During the six-month period in which Mrs. Zlatos made the alleged loans and transferred the Property to Saenz she was an eighty-six-year-old woman who was physically frail and unable to walk. Saenz and his daughter were hired by the Cagneys to provide Mrs. Zlatos with care and companionship twelve hours a day, seven days a week. The daughter would arrive in the morning to bathe Mrs. Zlatos and care for her until Saenz arrived in the afternoon to escort her to Grandview to visit Mr. Zlatos.

¶ 26 Mrs. Zlatos was entirely dependent on Saenz and his daughter during her waking hours. The fact that this assistance was provided in her home rather than in a nursing facility is irrelevant. The undisputed facts show that Mrs. Zlatos was in need of assistance to carry out many of her daily activities such as bathing, walking and meal preparation. Many of her financial activities were being handled by her son-in-law, including engaging Saenz and his daughter to care for her. Mrs. Zlatos's husband had handled many of these activities in earlier years, but by January 2000 he was neither able to do

them himself nor available at home to assist her.

¶ 27 Even putting aside the evidence showing that Mrs. Zlatos had at the very least begun a slide into dementia and mental impairment,[6] the uncontested facts discussed above show that she was physically impaired. Her ability to care for herself was plainly lessened due to her age and health problems.[7]

¶ 28 The next question is whether she was "unable to protect [herself] from abuse, neglect or exploitation by others" because of her physical impairment. The trial court found that "Mrs. Zlatos had frequent opportunities to raise concerns with bankers, doctors, escrow personnel and family members if she believed that Saenz was acting inappropriately, and no ... evidence has been presented" that she did so. The Davises argue that this shows that Mrs. Zlatos did not have an impairment that precluded her from protecting herself from abuse, neglect, or exploitation. We disagree.

¶ 29 Failing to complain is not persuasive evidence that a person is not vulnerable. Just because an individual does not act to protect herself by complaining about abuse, neglect, or exploitation does not mean that person is able to protect herself. As explained in a recent law review article:

> Elderly abuse is often difficult to detect because the victim is frequently reluctant to report the abuse. A victim may be ashamed to admit that she is experiencing any sort of abuse. The victim may be afraid of her abuser and may fear retaliation if she reports the behavior. She may not know where to find help. Ultimately, she may be too impaired to report the abuse, or, in some cases, to even realize that [she] is being abused. However, the circumstances surrounding financial abuse are further complicated because unlike the bruises that often accompany physical abuse, the signs of financial abuse may not be so obvious. Elderly victims are more likely to report physical abuse, believing that bodily injury is more threatening than any material loses [sic] they suffer. Further, many senior citizens are embarrassed about being financially victimized, and there are rarely witnesses to report it. Sometimes the elderly simply do not realize that anything is amiss.

Shelby A.D. Moore and Jeanette Schaefer, *Remembering the Forgotten Ones: Protecting the Elderly From Financial Abuse*, 41 San Diego L.Rev. 505, 509–11 (May–June 2004) (internal quotes and footnotes omitted).

¶ 30 In this case, there is nothing in the record to indicate that Mrs. Zlatos considered herself to be abused, neglected or exploited, but her silence does not control whether she was a "vulnerable adult" under the statute. As mentioned above, a victim may not even realize she is being abused or exploited, particularly when the issue is financial exploitation and she is willingly parting with her money or property. Exploitation may occur with the full participation of the victim, but it is no less exploitation. The legislature plainly intended the statute to increase protection for those who are "unable to protect" themselves. We do not believe the legislature intended the statute to apply only to elderly persons who can prove that they unsuccessfully fought against actual abuse, neglect or exploitation. Therefore, the trial court's finding that she had the opportunity to object cannot support the conclusion that she was able to protect herself.

¶ 31 Excluding the unsupported findings, and considering the undisputed facts, the trial court erred in concluding that Mrs. Zlatos was not a "vulnerable adult" under the APSA. She was a frail eighty-six-year-old in

---

6. Because we find the evidence shows that Mrs. Zlatos was physically impaired, we need not address whether she was also mentally impaired. The statute only requires a finding of "physical *or* mental impairment," not both.

7. The legislature recognized that advanced age may itself cause an impairment when it defined "incapacity" to mean "an impairment by reason of mental illness, mental deficiency, mental disorder, physical illness or disability, advanced age, chronic use of drugs, chronic intoxication...." A.R.S. § 46–451(A)(5). Although this list is not included in the accompanying definition of "vulnerable adult," we see no reason to exclude any of these causes of impairment when considering whether a person is "impaired" under that definition.

failing health. Many of her financial affairs were handled by the Cagneys. She was totally dependent on Saenz for her daily needs. With her husband in the hospital, she was alone for the first time in almost seventy years. Her dependence was so great that when Saenz had car trouble that made him late to care for Mrs. Zlatos, she immediately wanted to give him money to buy a new car "because I want to make sure that you're here everyday. I don't want you to be late like you were today." Her earlier fall had shown her inability to fully look after her physical needs without the assistance of others, and, indeed, the potential danger to her life if she tried. Under these facts, we must conclude that Mrs. Zlatos was physically impaired to such an extent that she was unable to protect herself if targeted for abuse, neglect or exploitation. Therefore, we hold that Mrs. Zlatos was a vulnerable adult under the APSA.

¶ 32 This conclusion does not, however, mean that the statute was violated when Mrs. Zlatos transferred property and money to Saenz. A vulnerable adult may still have the capacity to make financial decisions, deed property and transfer cash. The APSA is violated only if it is shown that the person in a position of trust and confidence to the vulnerable adult either (1) failed to act for the benefit of the vulnerable adult to the same extent as a trustee, A.R.S. § 46–456(A), or (2) by intimidation or deception knowingly took control, title, use or management of the vulnerable adult's property with the intent to permanently deprive the vulnerable person of the property. A.R.S. § 46–456(B). We find the trustee issue conclusive, therefore we need not consider whether Saenz's actions constituted intimidation or deception. Moreover, because the facts are undisputed, and for the most part based on Saenz's own testimony, there is no need to remand this issue for further fact-finding. The parties have fully briefed the issue, so we decide it on the record before us.

¶ 33 Pursuant to § 46–456(A), "[a] person who is in a position of trust and confidence to an incapacitated or vulnerable adult shall act for the benefit of that person to the same extent as a trustee pursuant to title 14, chapter 7, article 3." The trial court found that "Saenz was in a position of trust and confidence" to Mrs. Zlatos, and that finding is not disputed on appeal. Under Arizona law, a trustee is required to "observe the standard in dealing with the trust assets that would be observed by a prudent man dealing with the property of another." A.R.S. § 14–7302 (Supp.2004). "The first duty of any trustee is to act with undivided loyalty to the trustor." *Shetter v. Rochelle,* 2 Ariz.App. 358, 366, 409 P.2d 74, 82 (1965), *modified by* 2 Ariz.App. 607, 411 P.2d 45 (1966). Self-dealing can occur when "a trustee, acting for himself and also as trustee, seeks to consummate a deal where self interest is opposed to duty." *Seven G. Ranching Co. v. Stewart Title & Trust of Tucson,* 128 Ariz. 590, 592, 627 P.2d 1088, 1090 (App. 1981).

¶ 34 The record reveals that Mrs. Zlatos trusted and liked Saenz and was very grateful for his help over the years. The evidence, however, also illustrates that Mrs. Zlatos was very dependent on Saenz. Saenz was hired to provide care to Mrs. Zlatos, a vulnerable adult, and, therefore, in dealing with Mrs. Zlatos's assets he was expected to put her interests first, particularly when his own self-interest was involved. At the very least, a prudent trustee dealing with Mrs. Zlatos's assets would have advised her to seek the help of a family member or lawyer in making such transfers. If Mrs. Zlatos still wished to make the transfers after receiving independent advice, and possibly in the face of her advisor's outright opposition, Saenz could not be faulted for accepting her generosity. Instead, Saenz simply and quietly accepted the money and the Property from Mrs. Zlatos. In doing so he profited from such transactions to Mrs. Zlatos's detriment.

¶ 35 With regard to the real estate, the Davises argue that Saenz did not breach his fiduciary duty as a trustee because Mrs. Zlatos gifted the Property to Saenz for her own benefit. The record, however, shows that Saenz knew the transfer would not benefit Mrs. Zlatos. According to Saenz, Mrs. Zlatos transferred the Property so that he could live closer to her. Saenz testified, however, that he was not interested in the land

and never intended to build a home on the Property. Under these circumstances, there was no benefit to Mrs. Zlatos.

¶ 36 As for the loans made to Saenz, he clearly benefited to Mrs. Zlatos's detriment by acquiring large sums of her money. Saenz argued at trial that Mrs. Zlatos benefited from the loans because the loans made it possible for Saenz to continue his employment with her. His employment, however, was compensated and he does not allege that the compensation paid was unreasonable for the services provided. *See Kamrath v. Great Sw. Trust Corp.*, 27 Ariz.App. 102, 105, 551 P.2d 92, 95 (1976) (holding a trustee is not permitted to profit out of dealing with the trust, except for his lawful compensation). Moreover, Saenz never explained how Mrs. Zlatos benefited from forgiving the loans after she plainly labeled them as loans on the checks. A central aspect of acting as a trustee is accountability, so a trustee who accepts money from a vulnerable adult must be prepared to explain how the vulnerable adult benefited from the transfer. No such explanation was presented here.

¶ 37 Under these circumstances, we conclude that Saenz breached his fiduciary duties as a trustee in violation of § 46–456(A). Accordingly, Saenz is liable to Mrs. Zlatos for damages, A.R.S. § 46–456(C), and the trial court should quiet title to the Property in favor of the Zlatoses' estate. *See* A.R.S. §§ 46–455(F) (court may issue appropriate orders to remedy a violation); –456(O) (provisions of § 46–455(O) also apply to civil violations of § 46–456).

## CONCLUSION

¶ 38 For the reasons stated above, we reverse the judgment of the trial court and find in favor of the Appellants. Accordingly, we vacate the trial court's order quieting title of the Property in favor of the Davises and remand to the trial court with the direction to quiet title in favor of the Zlatoses' estate. Additionally, we remand the case to the trial court for a new trial to determine damages. Appellants request attorneys' fees on appeal pursuant to A.R.S. § 46–455. We grant the request. Accordingly, upon compliance with Arizona Rule of Civil Appellate Procedure 21, we award Appellants reasonable attorneys' fees and costs on appeal.

CONCURRING: DONN KESSLER, Presiding Judge, and JON W. THOMPSON, Judge.