238 P.3d 1265

ESTATE OF Jacob BRADEN, by and through its personal representative, Tonya GABALDON, Plaintiff/Appellant,

v.

The STATE of Arizona, a body politic; and The Division of Developmental Disabilities of the Arizona Department of Economic Security, a body politic, Defendants/Appellees.

No. 1 CA–CV 08–0764.

Court of Appeals of Arizona, Division 1, Department E.

June 29, 2010.

Law Office of Scott E. Boehm PC by Scott E. Boehm, Phoenix, and Knapp & Roberts PC by Craig A. Knapp, Scottsdale, and War-nock MacKinlay & Carman by Krista M. Carman, Prescott, Co–Counsel Attorneys for Plaintiff–Appellant.

Terry Goddard, Attorney General by Mi-chael Gaughan, Assistant Attorney General, and Fred M. Zeder, Assistant Attorney Gen-eral, Phoenix, Attorneys for Defendants–Ap-pellees.

## OPINION

OROZCO, Judge.

¶ 1 The Estate of Jacob Braden (the Es-tate) appeals from the entry of summary

judgment in favor of the State of Arizona and the Division of Developmental Disabilities (DDD) of the Department of Economic Security (DES) (collectively, the State) on the Estate's claim for statutory abuse or neglect under the Adult Protective Services Act (APSA) and the denial of the Estate's motion for a new trial. *See* Arizona Revised Statutes (A.R.S.) §§ 46–451 to –459 (Supp.2009).[1] For the reasons stated below, we reverse the grant of summary judgment in favor of the State and remand for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 Jacob Braden (Jacob) was a developmentally disabled adult who was eligible to receive services from the State pursuant to A.R.S. §§ 36–559 and –581.1 (2009). DDD is authorized to contract with private agencies to provide developmental disability services and programs to its clients. *See* A.R.S. § 36–552.D (2009). Through a vendor agreement, DDD contracted with Arizona Integrated Residential and Educational Services, Inc. (AIRES) to provide services for Jacob.[2] Jacob died in 2005 as a result of injuries he sustained while living at the AIRES facility.

¶ 3 The Estate filed a claim against the State and AIRES, alleging, among other claims, statutory abuse and neglect pursuant to A.R.S. § 46–455. The Estate claimed that the State was at fault for maintaining Jacob in an unsuitable living arrangement at the AIRES facility and for several negligent acts and omissions. The State filed a motion for summary judgment, arguing that it was not liable under A.R.S. § 46–455 because it did not assume a duty to provide care and was not employed to provide care for Jacob.

¶ 4 The trial court granted the motion for summary judgment finding that the State was not liable under section 46–455.B. The Estate filed a motion for new trial.

¶ 5 The court denied the motion for new trial. The court explained its ruling as follows:

> The word "employ" denotes a relationship between parties where one pays the other for services rendered. The State was not hired to care for the decedent and did not provide his actual, hands-on care. Although DES and DDD are funded in part through federal monies, this does not mean that the State was employed to provide care to the decedent.

> To "assume" a duty mean[s] to take upon one's self a duty. The State did not take upon itself the duty to provide the decedent's care. Rather, it was required to oversee and administer such care pursuant to A.R.S. § 36–551 *et seq.*

¶ 6 The Estate filed a timely notice of appeal. We have jurisdiction pursuant to A.R.S. § 12–2101.B and F.1 (2003).

## DISCUSSION

### I. Standard of Review

¶ 7 "We review issues of law involving statutory interpretation and a trial court's grant of summary judgment de novo." *Bentley v. Building Our Future*, 217 Ariz. 265, 270, ¶ 11, 172 P.3d 860, 865 (App.2007). When construing a statute, we look first to the statute's language because we expect it to be the best and most reliable indication of the statute's meaning. *Id.* at ¶ 12. "[W]here the [statutory] language is plain and unambiguous, courts generally must follow the text as written." *Canon Sch. Dist. No. 50 v. W.E.S. Constr. Co., Inc.*, 177 Ariz. 526, 529, 869 P.2d 500, 503 (1994). If the statute's language is ambiguous, we may resort to tools of statutory interpretation to determine the legislature's intent. *Bentley*, 217 Ariz. at 270, ¶ 13, 172 P.3d at 865. "In pursuing this goal, we consider the statute's context; its language, subject matter, and historical back-

---

1.  We cite to the current version of the applicable statutes because no revisions material to this opinion have occurred.

2.  The Estate's claims against AIRES are not at issue in this appeal.

ground; its effects and consequences; and its spirit and purpose." *Id.* (quoting *Hayes v. Continental Ins. Co.,* 178 Ariz. 264, 268, 872 P.2d 668, 672 (1994)). Additionally, "we attribute a plain and ordinary meaning to the statutory language to the extent that it does not frustrate the overall legislative intent and purpose of the statute." *Id.*

## II. State and DDD Liability Under APSA

¶ 8 Section 46–455.B imposes civil liability as follows:

> An incapacitated or vulnerable adult whose life or health is being or has been endangered or injured by neglect, abuse or exploitation may file an action in superior court against any person or enterprise that has been employed to provide care, that has assumed a legal duty to provide care or that has been appointed by a court to provide care to such incapacitated or vulnerable adult for having caused or permitted such conduct.

The question on appeal is whether the State may be liable under this statutory cause of action.[3] We first look at whether the State "provided care." If we find that it did, we next decide whether the State "assumed a legal duty to provide care" or was "employed to provide care."

### A. The State "Provided Care" to Jacob

■ ¶ 9 The Estate contends that by managing, planning, directing, and supervising Jacob's daily care, the State "provided care" under A.R.S. § 46–455.B. The State claims that it did not manage or direct Jacob's care and that AIRES was the caregiver. The State contends that § 46–455.B creates a cause of action only against one that is in a caregiver relationship.

¶ 10 This Court has rejected the claim that there must be a direct caregiver relationship

to give rise to liability under A.R.S. § 46–455.B. *Corbett v. ManorCare of Am., Inc.,* 213 Ariz. 618, 629, ¶ 36, 146 P.3d 1027, 1038 (App.2006). In *Corbett,* we held that it is not necessary that there be a "*direct* caregiver-patient relationship for liability to arise under APSA." *Id.* at 628, ¶ 33, 146 P.3d at 1037. As a result, we found that a director of nursing at a care facility could be held liable under the statute. *Id.* at 629, ¶ 38, 146 P.3d at 1038. In part, the duties of the director of nursing in *Corbett* included "managing the daily operations of the department of nursing services at the Tucson facility, which included overseeing patient care and staff education, 'helping to direct ... the clinical aspects of resident care,' managing the staff, and ensuring that federal and state regulations were followed." *Id.* In contrast, *Corbett* held that employees who had never met, spoken to, or had any personal contact with, and had no personal knowledge of the decedent's condition, her care, or her treatment did not "provide care" under the statute. *Id.* at ¶ 37.

¶ 11 The Estate suggests that the State "provided care" because it: (1) reserved authority to make determinations about Jacob's needs; (2) was required to monitor AIRES's compliance with the Qualified Vendor Agreement; (3) developed an individual service program (ISP)[4] and approved the care plan contained in the ISP; (4) attended all ISP meetings; (5) filled out Jacob's Rights, Health and Safeguards form; and (6) made staffing decisions.

¶ 12 The State asserts that its conduct is not analogous to the nursing supervisor in *Corbett.* The State claims it is not authorized to direct AIRES in the performance of its duties. It contends it does not "provide care" because it only obtains evaluations, develops goals, provides information about available service, and monitors a facility's

---

3. The Estate contends that "there is no question" that the State is an "enterprise" as defined by A.R.S. § 46–455.Q. The State does not dispute this basis. Therefore, we do not address this issue.

4. An ISP is a "written statement of services to be provided to an individual with developmental disabilities including habilitation goals and objectives and determinations as to which services, if any, the client may be assigned." *See* Arizona Administrative Code (A.A.C.) R6–6–101.40.

compliance with state standards. *See* A.R.S. § 36–551.8, 9 (2009) (defining case manager and case management); A.A.C. R6–6–601 (listing duties of case manager).

¶ 13 The State assigned a case manager and assembled the ISP team to recommend and coordinate services for Jacob. *See* A.R.S. §§ 36–551.8, 9, 26, –560.G (2009). Two DDD employees participated in Jacob's ISP meetings. One was a support coordinator, or case manager. *See* A.A.C. R6–6–601. The case manager met with Jacob's family, AIRES, and DES to create a services plan. She also prioritized needs. *See* A.A.C. R6–6–601.2. The State claims Jacob's family and AIRES made decisions about supervision and safety, and that the case manager only carried out responsibilities assigned to her under the ISP. The other employee was a registered nurse who apparently attended one ISP meeting to obtain updated information regarding Jacob's medical condition for DDD. *See id.*

¶ 14 We hold that creating Jacob's ISP, determining the level of supervision he needed, and ensuring that AIRES followed these requirements constituted "providing care." The case manager did far more than merely put Jacob's mother in contact with AIRES. She met with Jacob's mother and the hands-on caregivers to ensure Jacob was receiving the care the ISP required.[5] The State also decided staffing needs at AIRES and monitored AIRES's compliance with the vendor agreement, which incorporated the ISP. It follows then, that the State was responsible for monitoring AIRES's compliance with the ISP. In other words, the State monitored whether Jacob was receiving the care which it determined he needed.

■ ¶ 15 Our resolution of this close question is guided by the remedial nature of A.R.S. § 46–455 and our obligation to construe such legislation broadly. *See In re Estate of Winn,* 214 Ariz. 149, 150, ¶ 5, 150 P.3d 236, 237 (2007) (holding that courts shall construe section 46–455, a remedial statute, "broadly to effectuate the legislature's purpose in enacting" it); *Ariz. Civil Rights Div., Dep't of Law v. Hughes Air Corp.,* 139 Ariz. 309, 313, 678 P.2d 494, 498 (App.1983) ("A remedial statute is entitled to liberal construction."). APSA was passed to protect incapacitated and vulnerable adults. *Winn,* 214 Ariz. at 150, ¶ 5, 150 P.3d at 237. Its intent is to increase the remedies available to such individuals. *Id.* at 151, ¶ 9, 150 P.3d at 238; *see also Estate of McGill v. Albrecht,* 203 Ariz. 525, 528, ¶ 6, 57 P.3d 384, 387 (2002); *Corbett,* 213 Ariz. at 629, ¶ 34, 146 P.3d at 1038; *Davis v. Zlatos,* 211 Ariz. 519, 524, ¶ 19, 123 P.3d 1156, 1161 (App.2005). Consistent with that intent and our obligation to give remedial statutes a broad interpretation, we hold that, under the facts presented in the summary judgment briefing, the State "provided care."

### B. The State "Assumed a Legal Duty" to Provide Care

■ ¶ 16 The Estate contends that the State had a legal duty to provide care to Jacob. The State claims, however, that it did not act voluntarily and, therefore, did not "assume" a legal duty. The State's obligations regarding Jacob were imposed by statute. *See* A.R.S. §§ 36–551.01, –552.C, –2929.A.

■ ¶ 17 The Estate contends that the plain language of section 46–455.B includes any assumption of care, whether voluntary or compelled by statute. The Estate argues that courts cannot read into APSA a requirement that the legal duty must be voluntarily assumed because the legislature did not include any such limitation. *See Morgan v. Carillon Investments, Inc.,* 207 Ariz. 547, 552, ¶ 24, 88 P.3d 1159, 1164 (App.2004) (declining to interpret statutes to include a limitation period where none was included by the legislature). In drafting § 46–455, the legislature did not articulate that to "assume a

---

5. The Estate notes the fact that several documents relating to Jacob's care were on DDD letterhead or forms. This indicates some degree of involvement in providing care to Jacob, but we need not solely rely on this evidence in reaching our conclusion.

legal duty" requires voluntary action. "[S]tandard principles of statutory construction require that we do not judicially impose a requirement the legislature has intentionally chosen not to require." *Hart v. Hart*, 220 Ariz. 183, 187, ¶ 17, 204 P.3d 441, 445 (App. 2009). Without such limiting language in the statute, we will not interpret this remedial statute in such a narrow manner. *See Winn*, 214 Ariz. at 150, ¶ 5, 150 P.3d at 237; *Hughes Air Corp.*, 139 Ariz. at 313, 678 P.2d at 498.

¶ 18 Nevertheless, the State suggests that the word "assume" implies a voluntary nature. In interpreting statutory language, we give words their common meanings. *See Snyder v. Tucson Police Pub. Safety Pers. Ret. Sys. Bd.*, 201 Ariz. 137, 140, ¶ 12, 32 P.3d 420, 423 (App.2001). When a statute does not define a word, as in this case, courts may look to well-respected dictionary definitions. *Id.* The common definition of "assume" does not support the State's limited interpretation. "Assume" is defined to mean: to take up; to take upon oneself; to place oneself in; to seize; or to take over as one's own. *See* Merriam–Webster's Online Dictionary, *Http://www/merriam-webster.com/dictionary/assume* (last visited June 17, 2010). Based on this definition, we hold one could take up or take on a duty voluntarily or by mandate.

¶ 19 Furthermore, interpreting "assume" to include both voluntary and mandated legal duties comports with the statute's purpose. "By this act the legislature intends to ... [c]reate a civil cause of action for incapacitated adults against persons who *have a legal duty to provide care*, who are employed to provide care or who have been appointed by a court to provide care." 1989 Ariz. Sess. Laws, ch. 118, § 1 (1st Reg. Sess.) (emphasis added). By listing persons "who have a legal duty to provide care," the legislature necessarily intended to include persons who gained a legal duty to provide care voluntarily or by mandate. *Id.*

¶ 20 Additionally, interpreting § 46–455 to include a civil remedy against the State is consistent with other legislative mandates applicable to the State. A.R.S. § 36–592.F (2009) (requiring DES to: (1) conduct an annual site visit and (2) monitor each adult developmental home for compliance with department rules at least two times per year); A.R.S. § 36–557.F (2009) (requiring contracts for residential care services to allow the department to monitor for health, safety, contractual and programmatic standards at least every six months); A.R.S. § 36–557.B (requiring contracts for residential care services providers be subject to continuing program evaluation by DES to assure that service providers are in continued compliance with the terms of the contract and DES standards and requirements). If we accepted the State's interpretation, the State could simply contract with private care providers and then avoid any consequences for failing to meet these statutory obligations. However, we believe such a result would conflict with APSA's purpose of *increasing* the remedies available to vulnerable adults. *Winn*, 214 Ariz. at 150–51, ¶¶ 5, 9, 150 P.3d at 237–38.

¶ 21 Moreover, A.R.S. § 36–557.E.4 provides that "[a]ll clients enrolled in programs shall have all the same specified rights as they would have if enrolled in a program operated directly by the state."[6] Were we to interpret "assume a legal duty" to apply only when made voluntarily, disabled adults enrolled in state-operated programs would be unable to enforce their APSA rights against the State because the State was technically *mandated* to provide care to these individuals. *See* A.R.S. §§ 36–551.01, –552.C, –2929.A. We conclude this interpretation is wholly inconsistent with APSA's purpose and would render § 46–455 meaningless for individuals enrolled in state-operated programs. Accordingly, we reject it.

¶ 22 The State also argues that we must interpret the statute to apply only when one

---

**6.** According to the vendor agreement between the State and AIRES, the State "is responsible for providing community developmental services and supports to over 16,000 Arizonans with de-velopmental disabilities and acute care only or case management only to an additional 5,000 Arizonans with developmental disabilities."

voluntarily assumes a duty to provide care because "the term 'assumed' was originally included to address the situation where persons volunteer to provide care." However, the legislative history cited by the State does not support this position. First, the exchange described in the cited legislative history relates only to the section's "criminal liability" subsection. *See* Memorandum from Ariz. Senate Research Staff to Members of the Senate Judiciary Committee (Apr. 18, 1988).[7] Second, the legislative history indicates that the legislature amended the language to avoid a situation where someone who volunteers to provide care cannot withdraw from doing so without facing criminal liability. *Id.* This does not reflect intent to impose civil liability only upon volunteers, but rather evidences intent to narrow only the potential criminal liability of volunteers. We therefore hold that the State assumed a legal duty to provide care.[8]

¶ 23 The dissent discusses the similarity between A.R.S. § 46–455.A and B, the statute's criminal and civil subsections, respectively. The dissent argues that because the legislature borrowed language from the criminal subsection to write the civil subsection that the State's civil liability is precluded. However, the substantive differences between criminal and civil liability adequately distinguish A.R.S. § 46–455.A from B. We have held that the State "assumed a legal duty to provide care." In order for the State to be held criminally liable, it has to be employed to provide care, be a de facto guardian or conservator or has been appointed by the court to provide care for the vulnerable adult. Nothing in this opinion holds that the State was employed to provide care as a de facto guardian or conservator or was appointed by the court to provide care.

Therefore, the State could not be held criminally liable under A.R.S. § 46–455.A.

## C. APSA Does Not Exempt the State from Liability

¶ 24 APSA specifically exempts physicians, podiatrists, registered nurses and physicians' assistants. *See* A.R.S. § 46–455.B. The Estate argues that this specific exemption demonstrates the legislature's intent to hold all others, including the State, liable under APSA. *See In re Estate of Agans,* 196 Ariz. 367, 370, ¶ 16, 998 P.2d 449, 452 (App.1999) (recognizing rule of statutory interpretation that "expression of one or more items in a class generally indicates an intent to exclude all items of the same class that are not expressed"). The Estate argues that the trial court created governmental immunity where none exists in the statute.

¶ 25 The State argues that the legislature intended to exempt it from liability under APSA. The State points to the following language as evidence of the legislative intent that the State be exempt from liability:

> A person who files an action under this section shall serve notice and one copy of the pleading on the attorney general.... Service of the notice does not limit or otherwise affect the right of this state to maintain an action under this section or intervene in a pending action *nor does it authorize the person to name this state or the attorney general as a party to the action.*

A.R.S. § 46–455.J (emphasis added).

¶ 26 This language does not provide the immunity the State suggests. Rather, it indicates that service of notice of an action does not, alone, authorize naming the State

---

7. The State's answering brief cited the Minutes of the Senate Judiciary Committee meeting on April 19, 1988. However, those minutes reflect the legislative analyst's conclusion that volunteers are only criminally liable if they undertake a voluntary act and fail to exercise reasonable care in doing so. Minutes of Ariz. Senate Committee on Judiciary on H.B. 2399, 38th Leg., 2d Reg. Sess. (Apr. 19, 1988).

8. The Estate also claims that the State was "employed" to provide care under § 46–455.B. Based on the facts before us, we cannot say the State was "employed" to provide care under § 46–455.B.

or the attorney general as a party to that action. Where there is some independent legal basis for naming the State or attorney general as a party, we hold that the State may be named as a party. The legislature specifically excluded certain people from liability under the statute. *See* A.R.S. § 46–455.B. If the intent was also to provide immunity to the State, the legislature could have done so. *See Hart,* 220 Ariz. at 187, ¶ 17, 204 P.3d at 445; *see also Fid. Sec. Life Ins. Co. v. State Dep't of Ins.,* 191 Ariz. 222, 225, ¶ 7, 954 P.2d 580, 583 (1998) (stating that "liability of public servants is the rule in Arizona and immunity is the exception").

¶ 27 The State next argues that APSA is modeled after racketeering laws and because such laws provide that claims may not be brought against the State, we should interpret APSA in a similar fashion. *See* A.R.S. § 13–2314.04 (2010). We decline to do so because we have found no reason to believe APSA was modeled after the racketeering laws.

■ ¶ 28 The State argues that the government cannot be civilly liable under racketeering laws because it is not capable of forming criminal intent. A.R.S. § 13–2314.04.A (providing a civil remedy for "[a] person who sustains reasonably foreseeable injury ... by a pattern of racketeering activity"); *see, e.g., Lancaster Cmty. Hosp. v. Antelope Valley Hosp. Dist.,* 940 F.2d 397, 404 (9th Cir.1991) (holding that civil remedies authorized by the racketeering laws are inapplicable to government entities because they are incapable of forming the criminal intent required for racketeering). However, a civil cause of action under APSA does not require the formation of a criminal intent; rather, it only requires simple negligence. *See* A.R.S. § 46–455.B; *McGill,* 203 Ariz. at 530, ¶¶ 15–16, 57 P.3d at 389 (interpreting A.R.S. § 46–455.B to require only a single act of negligence to trigger APSA remedies). The criminal intent requirement of racketeering laws stands in stark contrast to the much lower "negligence" threshold needed for APSA's civil remedy to apply.

■ ¶ 29 Additionally, the State contends that racketeering laws are not applicable to the State because it is not subject to punitive damages. *See Anderson v. Dep't of Revenue,* 313 Or. 1, 6, 828 P.2d 1001, 1004 (1992) (stating that because RICO damages "are punitive in nature, subjecting the states to liability under RICO would override their common law immunity to punitive damages"). APSA, however, maintains Arizona's common law immunity for punitive damages. *See* A.R.S. § 46–455.H.4 (authorizing punitive damages "under common law principles that are generally applicable to the award of punitive damages in other civil actions"); *compare with* A.R.S. § 12–820.04 (2003) (exempting public entities from punitive damages in civil proceedings). We reject the State's claim that we should consider APSA analogous to the criminal racketeering laws because of the substantive differences between the statutes.

■ ¶ 30 The State also contends that any interpretation that applies section 46–455.B to the State results in an absurd situation where the attorney general could end up representing both the plaintiff and the State in an APSA action. The State may file an action on behalf of an injured person. *See* A.R.S. § 46–455.E. The attorney general, as in this case, may also defend the DDD. *See* A.R.S. § 41–192.A.1 (Supp.2009) (stating that the attorney general shall be the legal advisor of the State's departments).

¶ 31 We disagree, however, that this will cause absurd results. Section 46–455 allows private enforcement and therefore it is not necessary for the attorney general to represent *all* injured persons. Furthermore, when the attorney general brings an action on behalf of an injured person and the State or one of its Departments is also a named defendant, the attorney general may employ private attorneys in that particular case. *See* A.R.S. § 41–191.C (2004).

■ ¶ 32 The State also contends that the reporting requirement in A.R.S. § 46–457 would result in an absurdity if it was re-

quired to report itself for violations of APSA. We reject the State's argument because applying the reporting requirement to the State is consistent with the legislature's intent and comports with public policy.

¶ 33 The State also argues we should adopt its reading of APSA because subjecting the State to liability would expand the statute to produce a result at odds with its purpose. However, the statute was intended to *increase* the remedies available to incapacitated adults. *See McGill*, 203 Ariz. at 528, ¶ 6, 57 P.3d at 387. The State correctly notes that the legislature amended section 46–455.B to limit the liability of physicians after the Arizona Supreme Court issued *McGill*. The State forewarns this Court of adverse consequences if we were to "expand" the scope of section 46–455.B to include the State. The State predicts that adopting the Estate's position will pave the way for lawsuits challenging the State's program decisions. We disagree. Any claimant that sues the State under APSA must establish a compensable injury in order to justify an action. *See* A.R.S. § 46–455. We are confident that the limitations already written into the statute are sufficient to eliminate baseless suits and that our opinion will not open the floodgates for challenges to program decisions that do not result in abuse or neglect.

¶ 34 The State suggests that it is entitled to immunity for its administrative decisions under A.R.S. § 12–820.01.B.1(d) (2003), and that applying APSA to the State thwarts this "important immunity." Section 12–820.01.A.2 provides absolute immunity to the State for "[t]he exercise of an administrative function involving the determination of fundamental governmental policy." Additionally, "[t]he determination of a fundamental governmental policy involves the *exercise of discretion*," and includes the determination of whether to provide "governmental services." A.R.S. § 12–820.01.B.1(d) (emphasis added).

¶ 35 We have previously held that this absolute immunity "extends to determina-tions at a policy-making level rather than an operational level." *Schabel v. Deer Valley Unified Sch. Dist. No. 97*, 186 Ariz. 161, 166, 920 P.2d 41, 46 (App.1996). We reasoned in *Schabel* that "a decision by the district board to construct a playground at a school and allocate funds for that purpose would be a policy decision protected by immunity. Deciding what specific pieces of equipment to have on the playground ... would be an operational level decision" not entitled to immunity. *Id.* In this case, the State's decision to provide care to Jacob through a service provider was a determination made at a policy-making level subject to absolute immunity. In contrast, the State's determination of which services AIRES would provide and ensuring that those services were provided was a determination made at an operational level not subject to absolute immunity.

¶ 36 Additionally, we have reasoned that while absolute immunity shields policy determinations, the immunity does not extend to the negligent implementation of those policy determinations. *Diaz v. Magma Copper Co.*, 190 Ariz. 544, 554, 950 P.2d 1165, 1175 (App. 1997). In this case, the Estate did not challenge the State's policy determination to provide care through a service provider; rather, it claimed the State was negligent in ensuring the services contracted for were appropriately provided. In other words, the Estate is alleging the State was negligent in *supervising* the service provider. Accordingly, the State is not entitled to absolute immunity under A.R.S. § 12–820.01.B.1(d).

## CONCLUSION

¶ 37 We reverse the summary judgment in favor of the State and remand for further proceedings consistent with this opinion.

CONCURRING: DONN KESSLER, Judge.

HALL, Judge, dissenting.

¶ 38 The question presented in this appeal is whether the legislature intended that A.R.S. § 46–455(B) apply to the State as an

enterprise "that has assumed a legal duty to provide care." [9] Section 46–455 is part of an extensive statutory scheme that establishes a combination of private and public enforcement to protect and recompense vulnerable adults. See A.R.S. §§ 46–451 to –459. If the majority's conclusion that the State and DDD (and other state agencies or political subdivisions) qualify as enterprises that have assumed a legal duty to provide care is correct, then it would also have to be true that the legislature intended that the State engage in criminal and civil prosecutions that, if successful, would subject the State to liability for compensatory damages and attorneys' fees equal to twice the amount of damages. See A.R.S. § 46–455(H)(4). Because neither the statutory language nor legislative history suggests that the legislature intended such an improbable outcome, I dissent.

¶ 39 The majority's conclusion is premised on its belief that the State and DDD are "enterprise[s] … that ha[ve] assumed a legal duty to provide care[.]" Section 46–455(B) was enacted in 1989. See 1989 Ariz. Sess. Laws, ch. 118, § 3. This phrasing came from A.R.S. § 46–455(A), the criminal analogue to A.R.S. § 46–455(B), which was enacted in 1988. The intended meaning of this phrase is unclear from its language, and, unlike the majority, I believe there is some benefit to examining the legislative history underlying the passage and subsequent amendment to A.R.S. § 46–455(A). When originally proposed in 1988 as HB 2399, A.R.S. § 46–455(A) [10] provided: "A person who has been employed to provide care, or who has assumed the duty of providing care, or who has been appointed by a court to provide care. . . ." 1988 House Bills Thirty–Eighth Legislature (Sec. Reg. Sess. Vol. 3). Before passage, the bill was amended by

insertion of the word "legal" before "duty" to make clear that a volunteer would not be criminally liable unless it was determined that the volunteer had assumed a *legal* duty to provide care. See Minutes of the Committee on the Judiciary (April 19, 1988); Memorandum to Members of the Senate Judiciary Committee (April 18, 1988). As enacted, A.R.S. § 46–455 provided: "A person who has been employed to provide care, or who has assumed a legal duty to provide care, or who has been appointed by a court to provide care to an incapacitated adult and who causes or permits the life of the adult to be endangered, his health to be injured or to be imperiled by neglect is guilty of a class 1 misdemeanor." 1988 Ariz. Sess. Laws, ch. 85, § 2. In 1989, the legislature took the existing framework of A.R.S. § 46–455(A) and enacted A.R.S. § 46–455(B) to provide vulnerable adults a statutory civil cause of action under the APSA. Then in 1991, the legislature amended A.R.S. § 46–455(A) by substituting the phrase "who is a de facto guardian or de facto conservator" for "who has assumed a legal duty to provide care," but left unchanged A.R.S. § 46–455(B). 1991 Ariz. Sess. Laws, ch. 219, § 6. In sum, there is nothing in the legislative history to suggest that the legislature intended to subject the State or DDD to liability under A.R.S. § 46–455(B) as enterprises [11] that have *assumed* a duty to provide care.

¶ 40 I agree with the majority that neither the language of the statute nor its legislative history expressly excludes the State as an entity that can be said to have "assumed a legal duty to provide care" under A.R.S. § 46–455(B). But this does not necessarily mean that the legislature intended the State and its political subdivisions to be liable for money damages under the statute. Instead,

9. As did the trial court, I would also reject the Estate's alternative claim that it "employed" the State and DDD to provide care for Jacob. Because I believe the legislature did not intend the State to be one of the enterprises included within A.R.S. § 46–455(B), I find it unnecessary to address its remaining arguments.

10. Enacted as A.R.S. § 46–455 in 1988; reorganized as A.R.S. § 46–455(A) in 1989.

11. As defined in A.R.S. § 46–455(Q), an enterprise "means any corporation, partnership, association, labor union or other legal entity, or any group of persons associated in fact although not a legal entity, that is involved with providing care to a vulnerable adult."

I believe the intended scope of that phrase in A.R.S. § 46–455(B) can best be gleaned by examining its intended meaning when inserted as part of the criminal statute one year earlier.

¶ 41 The other two categories of persons subject to both criminal and civil liability consist of those who provide care for incapacitated persons based on a contractual obligation or court order. However, many incapacitated people receive care from family members, friends, or other caretakers on a "voluntary" basis. To fill this gap, HB 2399, as originally proposed, would have imposed criminal liability on any person who assumed a duty to provide care. To distinguish a volunteer whose care is casual or infrequent and who therefore should be allowed to withdraw from providing care without facing criminal liability for "neglect" from one who has assumed an ongoing duty to provide care, the bill was later amended to insert the word "legal" in an imperfect attempt to clarify that a person neither employed nor appointed by court order to provide care could be liable only if that person had nonetheless assumed a *legal* duty to provide care. Subsequently, as already mentioned, A.R.S. § 46–455(A) was amended by replacing that language with the phrase "who is a de facto guardian or de facto conservator[.]" Clearly, in the criminal version of the vulnerable adult statute, the State was not an entity that could be said to have assumed a legal duty to provide care.

¶ 42 The majority nonetheless asserts that the State and DDD have "assumed," in the sense of taking upon oneself, a legal duty to provide care to vulnerable adults because they are statutorily required through the Arizona Health Care Cost Containment System to provide services to all qualified disabled persons. A.R.S. § 36–2929 (2009); *see also* A.R.S. § 36–554(A)(1) (2009) (designating DDD as the developmental services authority for the State). Given the historical use of this phrase initially in a criminal context in A.R.S. § 46–455(A), this is not a plausible construction of its intended meaning in A.R.S. § 46–455(B). As originally contemplated by the legislature when inserted in the criminal statute, the concept of assuming a legal duty did not include a statutorily mandated duty. Surely, when it borrowed the phrase from a criminal statute, had the legislature intended to expand its meaning so as to make the State and its agencies liable for damages at the same time it was granting primary enforcement power to the State, it would have clearly stated so.

¶ 43 Finally, the legislative purpose in granting the State authority to institute both criminal and civil proceedings to protect vulnerable adults will be undermined if A.R.S. § 46–455(B) is construed as permitting vulnerable adults to file civil actions against the State and DDD. I would affirm the trial court's grant of summary judgment to the State and DDD.