STATE OF NEBRASKA, APPELLEE, V. RICK STUBBS, APPELLANT.
555 N.W.2d 55

Filed October 1, 1996.    No. A-95-940.

Blaine T. Gillett, of Lincoln County Public Defender's Office, for appellant.

Don Stenberg, Attorney General, and Jay C. Hinsley for appellee.

HANNON, SIEVERS, and MUES, Judges.

HANNON, Judge.

Rick Stubbs was convicted of knowing and intentional abuse of a vulnerable adult through exploitation pursuant to Neb. Rev. Stat. § 28-386 (Reissue 1995). He appeals from his conviction, arguing that the evidence was insufficient as a matter of law to sustain the jury's verdict and that he was not brought to trial within the time allowed by the speedy trial statute Neb. Rev. Stat. § 29-1207 (Reissue 1995). We find that the evidence was insufficient to prove that Stubbs exploited the alleged victim or that the victim was a "vulnerable adult" as defined by Neb. Rev. Stat. § 28-371 (Reissue 1995). We therefore reverse, and vacate his conviction and sentence.

## I. FACTS

Since Stubbs was convicted by a jury, we set forth the following pertinent facts in the light most favorable to the State, as we are required to do. See, *State v. Mantich*, 249 Neb. 311, 543 N.W.2d 181 (1996); *State v. Cisneros*, 248 Neb. 372, 535 N.W.2d 703 (1995).

In the spring of 1993, Dale Edmisten was 78 or 79 years old and lived by himself in a farmhouse 7 miles from Sutherland,

Nebraska. The previous winter, while on his way to Colorado to visit his niece, Janie Knickerbocker, Edmisten had an automobile accident, which apparently adversely affected his mental and physical well-being. Knickerbocker testified that Edmisten stayed with them for a while after the accident, that he appeared "confused," and that he "shuffled" when he walked.

Sometime in January 1993, Knickerbocker drove Edmisten home. That spring, Edmisten and Rick Stubbs established a relationship. Stubbs came to Edmisten's house several times, sometimes with his wife, and would sit and talk to Edmisten. During these talks, Stubbs would sometimes offer to buy things. Edmisten testified that after Stubbs left, he would find things missing from his shop, although he never saw Stubbs take anything and did not identify what specific items, other than "tools," were missing. On at least a couple of occasions, it appears that Edmisten sold items to Stubbs.

Knickerbocker visited Edmisten in March 1993. During this visit, Knickerbocker noticed that Edmisten still had memories of the past, but that he was not always aware of what was going on in the present. She also observed that he walked by shuffling his feet and that he "got fatigued" easily. During her visit, Knickerbocker obtained powers of attorney for both Edmisten's health and his financial affairs to protect Edmisten's welfare. At this time, she and her husband also put down a deposit on a retirement home in Sutherland, into which they planned to move Edmisten in May. In preparation for this move, Knickerbocker checked a list of items her mother had made to determine if those things were still at Edmisten's farm. At this time, she noticed that an oxbow and an anvil were missing.

In early May 1993, Knickerbocker returned to the area for the Hershey High School graduation and to check on Edmisten. On May 7, she noticed that several of the items that had been in Edmisten's house in March were now missing. Specifically, she found that a war ax, a dresser set, a trunk, and quilts were missing. Knickerbocker notified the county sheriff's office of the missing items.

Cpl. Mike Dye of the Lincoln County sheriff's office testified that based on information received in the course of his investigation of the missing items, he contacted Stubbs, who

admitted that he knew Edmisten, had been to his house, and had purchased some items from him. A warrant to search Stubbs' home was never issued, and apparently, none of the missing items were ever found.

On March 2, 1994, Stubbs was charged by information with the knowing and intentional abuse of a vulnerable adult by exploitation. Stubbs was arraigned on April 11, and the case was set for jury trial on July 12. In July, Stubbs' counsel filed a motion for continuance and made further motions for continuance until the time of trial. A jury trial was held on March 21, 1995.

At trial, the State adduced testimony from several witnesses concerning Edmisten's physical and mental health. Sandra Bay, who lived directly across the road from Edmisten and could see his driveway from her house's windows, testified that approximately 2 or 3 years before the trial, Edmisten had begun driving to get the mail and that during the spring of 1993, he would sometimes misjudge the distance to the mailbox and almost drive into the ditch on occasion. Kimberly Eckhoff, whose family had been close to Edmisten, testified that in late May 1993, she had helped Edmisten clean his house, which she described as a "mess," and that Edmisten had not helped at all. Furthermore, in January 1993, in response to a call from the grocery store that Edmisten had appeared weak and had been hanging on to his grocery cart to get around, Melvin Eckhoff, a longtime friend, began taking Edmisten to get groceries and to the bank at least once a week.

Ray Seifer, a neighbor of Edmisten's, testified that he took milk to Edmisten for his cats once or twice a week during the spring of 1993. He described Edmisten as not very mobile and stated that Edmisten needed to hang on to things to get around physically and was starting to have trouble remembering things.

According to Knickerbocker, after the Christmas accident, "it became apparent he couldn't live by himself anymore." Knickerbocker testified that it was very difficult for her uncle to move around, that he sat in his chair and watched television during most of the day, and that he rarely ate solid food, but drank lots of milk. However, she admitted that Edmisten understood the powers of attorney she had him sign in March 1993 and that

she had left him home alone after the accident in January until May, when she moved him to a retirement home. On July 2, Knickerbocker became the conservator of Edmisten's estate.

Edmisten testified that before moving to the retirement home, he basically sat in his chair during the day and was not able to walk around without holding on to something. However, he testified that he cooked his own meals, dressed himself, watched television, believed that he took care of his own bills, did not have to take any medicine, and was in pretty good health.

At trial, the State called as a witness Dr. George Cooper. Dr. Cooper graduated from the University of Nebraska College of Medicine and had been a family practitioner in North Platte since 1962. Forty to fifty percent of his practice was elderly, or geriatric, patients. In July 1993, Dr. Cooper examined Edmisten for 30 to 45 minutes. In a report he prepared after seeing Edmisten, Dr. Cooper diagnosed him as being mildly senile, having vertigo, and having proprioception deficit, which is loss of a sense of balance and would explain his "shuffling." Dr. Cooper explained that individuals who are mildly senile are usually able to perform their routine, daily living tasks, but are frequently not capable of sound judgment. He testified that mild senility would have impacted upon Edmisten's ability to live independently and to take care of himself. After stating that he was aware of the definition of a vulnerable adult in the Nebraska statutes, Dr. Cooper opined that "[b]ased upon the description of the witnesses preceding me I would surmise that it's very, very likely he would constitute a vulnerable adult."

The State attempted to show Stubbs' exploitation of Edmisten by showing that Stubbs took items from Edmisten's house and that Stubbs had paid far less for the John Deere tractor than it was worth. In support of the State's claim that Stubbs took items from the house, Bay testified that a red and white pickup drove by Edmisten's house or into his driveway on four occasions when Edmisten was gone one day. When Edmisten and Knickerbocker later returned to the home, they found that some things were missing. Bay acknowledged, though, that she had not seen Stubbs take anything and that she did not see any-

thing in the pickup the times that it stopped in Edmisten's driveway.

Kimberly Eckhoff testified that one day she and her husband drove by Edmisten's house to see if anything suspicious was going on. As they drove on the road to his house, they pulled behind a red pickup driven by a man with a mustache and beard and long hair, with a woman sitting next to him who had long, dark hair. After taking a back road, the Eckhoffs again passed the pickup, which was being driven slowly past Edmisten's house, and the man was pointing at the house. Kimberly Eckhoff wrote down the license plate number of the pickup, which later proved to be the license plate number of Stubbs' pickup. Bay reported to Corporal Dye the same license plate number of the pickup she had seen coming and going from Edmisten's house.

Alta Stubbs, Stubbs' mother, testified that she purchased a tractor from Edmisten on Stubbs' behalf for $3,500. Alta Stubbs testified that on the day she purchased the tractor, Edmisten told her that he wanted "'$3,500 for [the tractor] and not a penny less.'" Alta Stubbs' check to Edmisten was dated April 29, 1993.

On April 29, Stubbs sold the tractor to Dean Weinman and Ken Anderson for $5,500. A couple of days later, they sold the tractor to Glen Weinman, Dean's father, for $7,500. The record indicates that the tractor was in a general state of disrepair. Specifically, the hydraulics were leaking, the tires did not match, one tire was "shot," the fuel injection pump was leaking badly, the interior was "ratty," and the batteries did not work.

Several individuals testified as to the value of the tractor. In summary, these witnesses opined that the value of the tractor was somewhere between $5,500 and $11,000.

At the close of the evidence, the trial court ruled that the evidence was sufficient to sustain the State's charge under only the "substantial . . . functional impairment" portion of the statute. The jury then found Stubbs guilty of abuse of a vulnerable adult. Stubbs now appeals from his conviction.

## II. ASSIGNMENTS OF ERROR

Stubbs alleges that (1) the evidence was insufficient to support his conviction, (2) the jury misapplied the applicable law, and (3) the trial court erred in denying his motion to dismiss the information based on the State's failure to try him within the time allotted by the Nebraska speedy trial statutes.

## III. STANDARD OF REVIEW

On a claim of insufficiency of the evidence, an appellate court will not set aside a guilty verdict in a criminal case where such verdict is supported by relevant evidence. Only where evidence lacks sufficient probative force as a matter of law may an appellate court set aside a guilty verdict as unsupported by evidence beyond a reasonable doubt. *State v. Marks*, 248 Neb. 592, 537 N.W.2d 339 (1995); *State v. One 1985 Mercedes 190D Automobile*, 247 Neb. 335, 526 N.W.2d 657 (1995). In reviewing a criminal conviction, it is not the province of an appellate court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or reweigh the evidence. Such matters are for the finder of fact, and the verdict of the jury must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *Id.*

## IV. DISCUSSION

### 1. SPEEDY TRIAL

Stubbs argues that the trial court erred in denying his motion to dismiss on speedy trial grounds. Stubbs contends that although his attorney made motions for continuance on his behalf, only he may waive his right to a speedy trial. According to Stubbs, this requires the court to properly advise him of his right to a speedy trial. A trial court's determination of whether a complaint should be dismissed because of the failure of the State to provide the defendant with a speedy trial is a factual question which will be affirmed by an appellate court unless the determination was clearly erroneous. *State v. Richter*, 240 Neb. 223, 481 N.W.2d 200 (1992).

Nebraska's speedy trial statutes provide that "[e]very person . . . informed against for any offense shall be brought to

trial within six months . . . from the date . . . the information [is] filed." § 29-1207(1) and (2). The burden is upon the State to bring an accused to trial within the time provided by law, and if a defendant is not brought to trial within the 6 months provided for in § 29-1207, the defendant is entitled to an absolute discharge from the offense in the absence of an express waiver or a waiver of time as provided for in the speedy trial statutes Neb. Rev. Stat. §§ 29-1208 and 29-1209 (Reissue 1995). *State v. Beck*, 212 Neb. 701, 325 N.W.2d 148 (1982). When the defendant is not tried within 6 months, the burden of proof is upon the State that one or more of the excluded time periods under § 29-1207(4) is applicable. *Beck, supra.* To overcome a defendant's motion for discharge on speedy trial grounds, the State must prove the existence of an excludable period by a preponderance of the evidence. *State v. Alvarez*, 189 Neb. 281, 202 N.W.2d 604 (1972).

Section 29-1207(4) provides that "[t]he following periods shall be excluded in computing the time for trial: . . . (b) The period of delay resulting from a continuance granted at the request or with the consent of the defendant or his counsel." At trial, Stubbs' attorney stated that he had filed a motion for continuance in July 1994 and that he had filed other motions for continuance up until the current time. At oral argument, Stubbs' attorney stated that his motions for continuance were filed in good faith.

An information was filed against Stubbs on March 2, 1994. Thus, the State had until September 2, 1994, in which to bring Stubbs to trial. Stubbs was not tried until March 21, 1995. The record is clear that before Stubbs' trial date, which was set for July 21, 1994, Stubbs' attorney filed a motion for continuance and thereafter filed several more motions for continuance up until the time of trial. Section 29-1207(4)(b) clearly excludes from the 6-month time limit periods of delay resulting from continuances granted at the request of the defendant's counsel. The trial court's denial of Stubbs' motion to dismiss was not clearly erroneous, and this assignment of error is without merit.

## 2. INSUFFICIENCY OF EVIDENCE

Stubbs first argues that the evidence was insufficient to support his conviction. The relevant portion of § 28-386 provides that a "person commits knowing and intentional abuse of a vulnerable adult if he or she through a knowing and intentional act causes or permits a vulnerable adult to be . . . [e]xploited."

### (a) Vulnerable Adult

Stubbs contends that the evidence did not support the jury's finding that Edmisten was a "vulnerable adult." Section 28-371 defines "vulnerable adult" as "any person eighteen years of age or older who has a substantial mental or functional impairment or for whom a guardian has been appointed under the Nebraska Probate Code." "Substantial mental impairment" is defined as "a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, or ability to live independently or provide self-care as revealed by observation, diagnosis, investigation, or evaluation." Neb. Rev. Stat. § 28-369 (Reissue 1995). However, at the end of trial, the trial court found that the evidence was insufficient to sustain a verdict on the "substantial mental impairment" portion of the statute. At oral argument, the State stipulated that the only issue on appeal was whether Edmisten suffered from a "substantial functional impairment." We will therefore address only this portion of the statute.

"Substantial functional impairment" is defined as "a substantial incapability, because of physical limitations, of living independently or providing self-care as determined through observation, diagnosis, investigation, or evaluation." Neb. Rev. Stat. § 28-368 (Reissue 1995). Neb. Rev. Stat. § 28-361 (Reissue 1995) provides that "living independently" "shall include, but not be limited to, using the telephone, shopping, preparing food, housekeeping, and administering medications." "Self-care" is defined as including, but not limited to, "personal hygiene, eating, and dressing." Neb. Rev. Stat. § 28-366 (Reissue 1995).

The evidence presented by the State in support of its claim that Edmisten had a substantial functional impairment consisted of the observations of several of Edmisten's friends, neighbors, and relatives, and a doctor's diagnosis. Edmisten's physical lim-

itations testified to by these witnesses may be summarized as the following: He had difficulty moving around and needed to hang on to things when he walked; he could no longer walk to the end of the lane to get his mail, but needed to drive; he was seen leaning weakly on his shopping cart for support on one occasion; he kept a "messy" house on one occasion; for a period of time, his diet consisted mainly of milk and other liquids; and he led a sedentary lifestyle, which included sitting in a chair watching television most of the day. Dr. Cooper diagnosed Edmisten as having proprioception deficit, which resulted in a loss of balance and could explain his "shuffling." Dr. Cooper also opined that Edmisten was "mildly senile," which could have impacted upon Edmisten's ability to live independently and to take care of himself.

Dr. Cooper, however, testified that Edmisten had no respiratory problems, circulatory problems, or heart problems, and that his blood pressure was normal. More significantly, Edmisten testified that he got along all right living alone and that he cooked his own meals, including steak and pizza; dressed himself; bathed himself; watched television; believed that he took care of his own bills; and considered himself to be in pretty good health.

Witnesses testified that Edmisten was not "as sharp" as he had been in the past and that he was physically slowing down. Knickerbocker also testified that "it became apparent that he couldn't live by himself anymore." These statements, however, are conclusory statements, not factual examples of how Edmisten was incapable of living independently or caring for himself.

The factual evidence supports a finding that Edmisten was physically and mentally aging. The evidence does not, however, support a finding that he was at the point in his life where he suffered from a substantial functional impairment which left him incapable of caring for himself or living independently. This conclusion is supported most clearly by Edmisten's own testimony, but is also strengthened by the fact that Knickerbocker, who had obviously assumed the primary care for her uncle, was willing to leave him to live alone from January through the end of May 1993 and then alleged he was

no longer able to live independently. We therefore find that the evidence, even when taken in the light most favorable to the State, is insufficient as a matter of law to support a finding that Edmisten was a "vulnerable adult" as defined by § 28-371.

### (b) Exploitation

Stubbs also asserts that the evidence was insufficient as a matter of law for the jury to find that he exploited Edmisten. Neb. Rev. Stat. § 28-358 (Reissue 1995) provides that "exploitation" "shall mean the taking of property of a vulnerable adult by means of undue influence, breach of a fiduciary relationship, deception, or extortion or by any unlawful means."

The record shows that Stubbs visited Edmisten on several occasions. During these visits, Stubbs had access to Edmisten's entire house. Bay and Kimberly Eckhoff testified that they saw Stubbs' pickup drive slowly by Edmisten's house on different occasions, and Bay testified that she saw Stubbs' pickup drive into Edmisten's driveway three times on May 7, the day that Knickerbocker found several items missing. Bay admitted on cross-examination, however, that she did not see who was driving the pickup, nor did she see anything in the pickup when it left. Edmisten testified that he would find that things were missing from his shop after Stubbs had visited. However, he admitted that he sometimes would not go outside to the shop until a day or more later.

We find that the evidence, even when taken in the light most favorable to the State, is insufficient to support a finding that Edmisten was exploited by Stubbs. The evidence clearly does not establish that Stubbs took Edmisten's property by means of undue influence, breach of a fiduciary relationship, deception, or extortion. Edmisten testified that Stubbs was never mean to him, never threatened or yelled at him, and never scared him. The fact that Stubbs purchased a tractor for less than what its value was to someone else similarly does not establish undue influence, deception, or extortion on his part. No one is suggesting that Dean Weinman and Anderson, who purchased the tractor from Stubbs for $5,500 and sold it only a couple of days later for $7,500, deceived Stubbs in any way.

The only other unlawful means suggested by the evidence is that Stubbs took items from Edmisten's house by theft. The record shows that Stubbs had the opportunity to steal the missing items from Edmisten's house. However, no one ever saw Stubbs take anything. In addition, none of the items were ever found in Stubbs' possession. We therefore find that the evidence was insufficient to find that Stubbs stole certain items from Edmisten.

■ Moreover, although § 28-386 does not provide that there must be a nexus between a vulnerable adult's impairment and the exploitation, it seems evident that this was the intent of the statute, and we now hold that this is a requirement of the statute. In this case, the jury determined that Edmisten suffered from a "substantial functional impairment" that left him incapable of living independently or providing care for himself. The State alleged that Stubbs exploited Edmisten by taking things from his house and by taking advantage of him mentally when Stubbs received an advantageous bargain in purchasing the tractor. It is hard to imagine, however, how Edmisten's physical limitations facilitated Stubbs' exploitation of Edmisten. Although Dr. Cooper diagnosed Edmisten as being "mildly senile," the court ruled that there was insufficient evidence to support a finding that Edmisten suffered from a "substantial mental impairment." We therefore find that the evidence was insufficient as a matter of law to support the jury's finding that Stubbs exploited Edmisten.

Since we find that Edmisten was not a vulnerable adult and that he was not exploited, we need not address Stubbs' other alleged error. The trial court's judgment is reversed, and Stubbs' conviction and sentence are vacated.

CONVICTION AND SENTENCE VACATED.