757 S.E.2d 711

**In the Interest of Jane DOE,[1] A Vulnerable Adult, Appellant,**

v.

**SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent.**

**Appellate Case No. 2013–000944.**

**No. 27385.**

Supreme Court of South Carolina.

Heard Feb. 19, 2014.

Decided April 30, 2014.

---

1. We use the name "Jane Doe" to protect the identity of the Appellant.

624

Manton M. Grier, Jr., of Nexsen Pruet, LLC of Columbia, for Appellant.

Claude Robin Chandler, of Columbia, for Respondent.

Justice BEATTY.

In this direct appeal, Jane Doe appeals the family court's order declaring her to be a "vulnerable adult" and in need of protective services pursuant to the South Carolina Omnibus Adult Protection Act ("the Act").[2] Doe contends the South Carolina Department of Social Services ("DSS") failed to prove that she is a vulnerable adult[3] at substantial risk of neglect[4] due solely to her advanced age. Doe seeks reversal of the family court's order so that she may be released from involuntary protective custody and returned to her home. Because we find that Doe did not meet the statutory definition of a vulnerable adult under the Act, we reverse. However, because there may have been significant changes to Doe's physical and mental health and to the condition of Doe's home during the pendency of this appeal, we remand the case in order for the family court to conduct a review hearing to assess the current status of Doe's case.

---

**2.** S.C.Code Ann. §§ 43–35–5 to –595 (Supp.2013).

**3.** The Act defines a "vulnerable adult" as:

[A] person eighteen years of age or older who has a physical or mental condition which substantially impairs the person from adequately providing for his or her own care or protection. This includes *a person who is impaired in the ability to adequately provide for the person's own care or protection because of the infirmities of aging including,* but not limited to, organic brain damage, *advanced age,* and physical, mental, or emotional dysfunction. A resident of a facility is a vulnerable adult.

*Id.* § 43–35–10(11) (emphasis added).

**4.** The Act defines "neglect" to include "the inability of a vulnerable adult, in the absence of a caretaker, to provide for his or her own health or safety which produces or could reasonably be expected to produce serious physical or psychological harm or substantial risk of death." *Id.* § 43–35–10(6).

## I. Factual/Procedural History

In 1993, the General Assembly promulgated the Act to establish a system to protect vulnerable adults in South Carolina from abuse, neglect, and exploitation. Act No. 110, § 1, 1993 S.C. Acts 257. The Act is intended to address the continuing needs of vulnerable adults and to provide services in the least restrictive setting possible. S.C.Code Ann. § 43–35–5 (Supp.2013); *Williams v. Watkins*, 379 S.C. 530, 665 S.E.2d 243 (Ct.App.2008). The Act identifies the appropriate investigative entities[5] and clarifies the roles and responsibilities of the agencies involved in the system. *Id.* §§ 43–35–15 to –20. The Act further provides procedures for reporting, investigating, and adjudicating criminal and noncriminal allegations of adult abuse, neglect, and exploitation. *Id.* §§ 43–35–25 to –85.

On July 31, 2012, pursuant to the Act, deputies with the Richland County Sheriff's Department investigated a report[6] involving Doe, an eighty-six-year-old woman who lives alone, is without family support, and suffers from a heart condition.[7] When they arrived, Doe refused to allow the deputies to enter her home and, in fact, had barricaded the windows and the doors for "security purposes." The deputies, however, were able to observe that the home was "in an unsanitary and

---

**5.** *Id.* § 43–35–10(5) (" 'Investigative entity' " means "the Long Term Care Ombudsman Program, the Adult Protective Services Program in the Department of Social Services, the Vulnerable Adults Investigations Unit of the South Carolina Law Enforcement Division, or the Medicaid Fraud Control Unit of the Office of the Attorney General.").

**6.** It is unclear who contacted the Richland County Sheriff's Department; however, such voluntary reporting is permissible as the Act not only provides for mandatory reporting, but also states that "any other person who has reason to believe that a vulnerable adult has been or may be abused, neglected, or exploited may report the incident." *Id.* § 43–35–25(B).

**7.** *Id.* § 43–35–55(A) ("A law enforcement officer may take a vulnerable adult in a life-threatening situation into protective custody if: (1) there is probable cause to believe that by reason of abuse, neglect, or exploitation there exists an imminent danger to the vulnerable adult's life or physical safety; (2) the vulnerable adult or caregiver does not consent to protective custody; and (3) there is not time to apply for a court order.").

deplorable condition." Specifically, the deputies noticed a hole in the roof and that there was a hose running from Doe's home to a neighbor's home, which provided the only source of water. As they peered through the windows of Doe's home, the deputies saw mold on the window curtains and piles of items on the floor giving the appearance that Doe was a "hoarder." Based on their investigation, the deputies placed Doe in emergency protective custody and transported her to the hospital.[8]

Immediately thereafter, the Richland County Sheriff's Department notified the Adult Protective Services Program of DSS in Richland County regarding its decision to remove Doe from her home.[9] On August 1, 2012, DSS filed a petition in family court [10] seeking a determination that Doe was a vulnerable adult within the meaning of the Act because, as a consequence of the condition of her home, she was in substantial danger of abuse, neglect, or exploitation. Because DSS believed Doe was in need of protective services,[11] it requested the court grant protective custody of Doe to DSS.

---

8. *Id.* § 43–35–55(B) ("When a law enforcement officer takes protective custody of a vulnerable adult, the officer must transport the vulnerable adult to a place of safety which must not be a facility for the detention of criminal offenders or of persons accused of crimes. The Adult Protective Services Program has custody of the vulnerable adult pending the family court hearing to determine if there is probable cause for protective custody.").

9. *Id.* § 43–35–55(D) ("When a law enforcement officer takes protective custody of a vulnerable adult under this section, the law enforcement officer must immediately notify the Adult Protective Services Program and the Department of Social Services in the county where the vulnerable adult was situated at the time of being taken into protective custody.").

10. *Id.* § 43–35–55(E) ("The Department of Social Services is responsible for filing a petition for protective custody within one business day of receiving the notification required by subsection (D).").

11. *Id.* § 43–35–10(9) (" 'Protective services' means those services whose objective is to protect a vulnerable adult from harm caused by the vulnerable adult or another. These services include, but are not limited to, evaluating the need for protective services, securing and coordinating existing services, arranging for living quarters, obtaining financial benefits to which a vulnerable adult is entitled, and securing medical services, supplies, and legal services.").

The same day, the family court held a hearing on the petition. On August 7, 2012, the court issued a 72–Hour–Hearing Order [12] wherein it found there was probable cause for law enforcement to take Doe into emergency protective custody. The court also scheduled a merits hearing for September 6, 2012 and ordered a guardian ad litem (GAL) to be appointed for Doe as well as counsel for both Doe and the GAL. Additionally, the court ordered Doe's social security benefits or her funds to be redirected to pay for her care at Carson's Community Care Home where DSS had placed Doe.[13]

After granting four continuances, the family court held a merits hearing on March 25, 2013.[14] At the hearing, DSS presented the report of Dr. Marc Harari, a licensed counseling psychologist, who evaluated Doe on March 21, 2013. Based on his assessment, Dr. Harari concluded that Doe possessed a "sound mental status" as Doe was logical and coherent in her responses, fully oriented and in contact with reality, exhibited excellent long-term memory skills, and was fully aware of the situational circumstances resulting in the involvement of DSS. He also assessed Doe's cognitive ability to be within the "Low–Average range." Although Doe demonstrated some hearing problems, Dr. Harari found she responded appropriately when the examiner and testing assistant spoke loudly. Dr. Harari, however, reported that Doe underwent open heart surgery in 2003, continues to receive medical treatment to address cardiac functioning, and takes medication for arthritis

---

12. *Id.* § 43–35–55(F) ("The family court shall hold a hearing to determine whether there is probable cause for the protective custody within seventy-two hours of the Department of Social Services filing the petition, excluding Saturdays, Sundays, and legal holidays.").

13. *Id.* § 43–35–45(I) ("If the court determines that the vulnerable adult is financially capable of paying for services ordered pursuant to this section, then payment by or from the financial resources of the vulnerable adult may be ordered.").

14. Despite the Act's mandate that the family court hold a hearing on the merits within forty days of the petition being filed, more than seven months elapsed in this case due to the continuances granted. *See id.* § 43–35–45(C) (stating that "within forty days of the petition being filed the court shall hold a hearing on the merits"). We note, however, that Doe's counsel either initiated or consented to the issuance of each order.

and eye problems. Dr. Harari did not discern that Doe had any obvious mental health issues other than situational anxiety related to her desire to resume living at home.

Ultimately, Dr. Harari concluded that Doe appeared to have "the minimum levels of competency to function independently" as there was no evidence of dementia, severe emotional issues, or obvious physical limitations. Despite this conclusion, Dr. Harari noted his concerns regarding Doe's self-admitted lack of finances needed to repair her home, her limited social support system other than members of her church and a neighbor, and her need for continued medical monitoring due to her medical conditions and advanced age. If the court determined that Doe could return home, Dr. Harari recommended that DSS maintain an open treatment case to ensure Doe's home was repaired and that Doe interacted with peers to alleviate Doe's feelings of isolation.

Although counsel for DSS acknowledged Dr. Harari's conclusion regarding Doe's competency, he emphasized Doe's advanced age, medical issues, and the condition of Doe's home. Specifically, counsel noted that Doe had a minor heart condition and hypertension, but conceded there is "nothing in [the record] to indicate that chronic medical needs are not being addressed." Counsel also admitted there was "very little evidence to establish the threshold [determination] that she's a vulnerable adult." Due to this "scintilla of evidence," counsel stated he had debated whether to ask the court to dismiss the petition filed by DSS.

In response, Doe's counsel disputed the claim that Doe qualifies as a vulnerable adult due solely to her advanced age because Doe had been deemed competent by Dr. Harari. Counsel also described Doe as a "fiercely independent" woman who wanted to return to the home that she had lived in since 1967 and did not want any of the services provided by DSS.

The GAL's counsel indicated that the GAL was reticent to make a recommendation as to whether Doe met the statutory definition of a vulnerable adult given the lack of supporting evidence and limited case law interpreting the Act. However, counsel acknowledged that, pursuant to the Act, Doe would have to be deemed a vulnerable adult in danger of neglect in

order for DSS to provide Doe with the necessary services to address her unfavorable living conditions.

When questioned by the court about the current state of her home, Doe replied that the hole in the roof had been patched and there was no longer a leak in the house. She further explained her water had been turned off due to a dispute with the water company over an outstanding bill. However, Doe stated she had since paid the bill and could now request to have the water turned back on. DSS could not confirm the current state of Doe's home because Doe had refused to let the caseworker enter the home and DSS had not procured an inspection warrant.[15]

On March 28, 2013, the court issued a written order that confirmed the oral ruling delivered at the conclusion of the hearing. The court found Doe met the statutory definition of a vulnerable adult because "due to the infirmities of aging, she cannot fully and completely provide for her own safety." The court noted that the condition of Doe's home "played a major role in her being taken into emergency protective custody." Although the court acknowledged Doe has the "minimum levels of competency to function independently," it relied on Dr. Harari's finding that Doe requires medical monitoring given Doe's medical conditions and advanced age. Additionally, the court concluded Doe was in need of protective services based on Dr. Harari's suggestion of an open treatment case to ensure that the essential repairs were made to Doe's home.

As a result of these findings, the court ordered DSS to provide Doe with the necessary services to make Doe's home habitable. Specifically, the court ordered for: (1) the water supply to be reconnected; (2) the house to be "subjectively clean," which meant "clean within a reasonable degree" not necessarily "perfectly clean"; (3) electrical power to be supplied, if not already, to the house; (4) the heating system to be operational; (5) an air conditioning system, if in place, to be

---

15. *Id.* § 43–35–45(A) ("In investigating a report if consent cannot be obtained for access to the vulnerable adult or the premises, the investigative entity may seek a warrant from the family court to enter and inspect and photograph the premises and the condition of the vulnerable adult. The court shall issue a warrant upon a showing of probable cause that the vulnerable adult has been abused, neglected, or exploited or is at risk of abuse, neglect, or exploitation.").

operational; and (6) the house to have adequate food and cleaning supplies. The court instructed that Doe should remain in the custody of DSS until each item had been completed. Upon completion, Doe could return home but DSS was ordered to "monitor the home in compliance with its policy." Finally, the court scheduled a hearing on June 20, 2013, at which time the court would review the progress of the home repairs and determine whether Doe was financially capable of paying for the ordered services.

After Doe appealed to the Court of Appeals, the appeal was certified to this Court pursuant to Rule 204(b) of the South Carolina Appellate Court Rules. As a result of the notice of appeal being filed, the family court issued an order continuing the review hearing. *See* Rule 205, SCACR ("Upon the service of the notice of appeal, the appellate court shall have exclusive jurisdiction over the appeal.").

## II. Standard of Review

■■■ "The family court is a court of equity." *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 652 (2011). In appeals from the family court, the appellate court reviews factual and legal issues de novo. *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). *"De novo* review permits appellate court fact-finding, notwithstanding the presence of evidence supporting the [family] court's findings." *Lewis*, 392 S.C. at 390, 709 S.E.2d at 654–55. "However, we recognize this broad scope of review does not alter the fact that a family court is better able to make credibility determinations because it has the opportunity to observe the witnesses." *Wilburn v. Wilburn*, 403 S.C. 372, 380, 743 S.E.2d 734, 738 (2013). "Additionally, the de novo standard does not relieve the appellant of the burden of identifying error in the family court's findings." *Id.* Accordingly, this Court will affirm the decision of the family court unless the decision is controlled by an error of law or the appellant satisfies the burden of showing the preponderance of the evidence actually supports contrary factual findings by the appellate court. *Id.;* *DiMarco v. DiMarco*, 399 S.C. 295, 299, 731 S.E.2d 617, 619 (Ct.App.2012).

## III. Discussion

### A. Arguments

Doe contends the family court erred in classifying her as a vulnerable adult and ordering her continued custody with DSS until the completion of the itemized protective services. In support of this contention, Doe claims DSS failed to prove that she is a vulnerable adult as there is no evidence she has a physical or mental condition that substantially impairs her ability to care for and protect herself. Rather, Doe asserts the sole basis for the family court's decision was her advanced age. Because advanced age alone is not sufficient to warrant the application of the Act, Doe seeks reversal of the family court's order.

Alternatively, Doe argues that even if she is deemed a vulnerable adult, there is no evidence that she was at substantial risk of being neglected. Specifically, Doe asserts DSS did not present any evidence regarding the condition of the home as it failed to procure an inspection warrant to enter the home. She notes the home conditions that precipitated her removal by DSS have been remedied as the leak in the home has been fixed and she is able to have the water supply turned back on. Finally, Doe contends DSS "offered no proof that a supposedly messy home" put her at a substantial risk of neglect.

### B. Analysis

#### 1. Three–Part Analysis

In analyzing this appeal, the Court must answer the following three questions: (1) was Doe a "vulnerable adult" under the Act; (2) if so, was she at substantial risk of being neglected due to this status; and, in turn, (3) were protective services necessary to protect Doe from the substantial risk of neglect? S.C.Code Ann. § 43–35–45(E) (Supp.2013). In answering these questions, we reference the well-established rules of statutory construction.

"The cardinal rule of statutory interpretation is to ascertain and effectuate the intention of the legislature." *Sloan v. Hardee*, 371 S.C. 495, 498, 640 S.E.2d 457, 459 (2007). "When a statute's terms are clear and unambiguous on their face, there is no room for statutory construction and a court

must apply the statute according to its literal meaning." *Id.* In interpreting a statute, "[w]ords must be given their plain and ordinary meaning without resort to subtle or forced construction to limit or expand the statute's operation." *Id.* at 499, 640 S.E.2d at 459. Further, "the statute must be read as a whole and sections which are a part of the same general statutory law must be construed together and each one given effect." *S.C. State Ports Auth. v. Jasper Cnty.*, 368 S.C. 388, 398, 629 S.E.2d 624, 629 (2006).

"If the statute is ambiguous ... courts must construe the terms of the statute." *Town of Mt. Pleasant v. Roberts*, 393 S.C. 332, 342, 713 S.E.2d 278, 283 (2011) (citation omitted). The statutory language must be construed in light of the intended purpose of the statute. *Id.* This Court will not construe a statute in a way which leads to an absurd result or renders it meaningless. *See Lancaster Cnty. Bar Ass'n v. S.C. Comm'n on Indigent Defense*, 380 S.C. 219, 222, 670 S.E.2d 371, 373 (2008) ("In construing a statute, this Court will reject an interpretation when such an interpretation leads to an absurd result that could not have been intended by the legislature.").

## 2. General Definition of a "Vulnerable Adult"

Cognizant of the above-outlined rules, we turn to the text of the Act, which defines a "vulnerable adult" as:

[A] person eighteen years of age or older who has a physical or mental condition which substantially impairs the person from adequately providing for his or her own care or protection. This includes *a person who is impaired in the ability to adequately provide for the person's own care or protection because of the infirmities of aging including,* but not limited to, organic brain damage, *advanced age,* and physical, mental, or emotional dysfunction. A resident of a facility is a vulnerable adult.

S.C.Code Ann. § 43–35–10(11) (Supp.2013) (emphasis added). By its clear terms, the infirmities of aging must "substantially impair" the person's ability to adequately provide for his or her own care or protection. Because the Act does not define "impair," we have looked to the ordinary meaning of the word. "Impair" means "to make worse by or as if by diminishing in

some material respect." *Merriam–Webster's New Collegiate Dictionary* 569 (8th ed.1981). In disability law, "severe impairment" is defined as "a physical or mental impairment that greatly restricts a person's ability to perform ordinary, necessary tasks of daily life." *Black's Law Dictionary* 819 (9th ed.2009). Thus, we hold for a person to be deemed a vulnerable adult under the Act the person's physical or mental condition, including advanced age, must cause a diminished ability to adequately provide for self-care or protection.

Although our research revealed no cases directly on point in South Carolina or other jurisdictions, there are cases in analogous contexts that support this interpretation of a vulnerable adult. Specifically, we have looked for guidance in those cases where the term "vulnerable adult" was analyzed for the appointment of a conservatorship, the basis of a civil suit for the exploitation of a vulnerable adult, and the basis of a criminal charge for the abuse or exploitation of a vulnerable adult.

In cases where family members have petitioned for the imposition of a conservatorship for their elderly relative, the reviewing courts have required more than evidence of advanced age. Rather, the courts have declined to order a conservatorship unless there is evidence that the subject's advanced age directly affected the ability to make decisions regarding the subject's property. *See, e.g., In re the Conservatorship of Townsend,* 293 Mich.App. 182, 809 N.W.2d 424, 429 (2011) (reversing probate court's finding that petitioner's mother was a "vulnerable adult" as there was no evidence that mother had a "mental, physical, or advanced-age related impairment" that rendered her unable to say no to her family members regarding decisions involving her property); *In re the Conservatorship of Goodman,* 766 P.2d 1010 (Okla.Ct.App. 1988) (holding conservatorship could not be constitutionally imposed over property of 86–year–old adult due to his advanced age without a finding of mental incompetence); *Endicott v. Saul,* 142 Wash.App. 899, 176 P.3d 560 (2008) (affirming sons' petition to establish guardianship over their 80–year–old mother and finding mother was a "vulnerable adult" for purposes of Abuse of Vulnerable Adults Act where there was testimony that the mother could not independently manage her finances or take care of herself).

Similarly, in order to sustain a cause of action under state adult protective services legislation, courts have required the party to present evidence that an elderly victim was unable to protect or care for himself due to a physical or mental condition. *See Davis v. Zlatos,* 211 Ariz. 519, 123 P.3d 1156, 1163 (Ariz.Ct.App.2005) (holding, in a civil suit involving a violation of the Arizona Adult Protective Services Act, that elderly victim was a "vulnerable adult" because it was uncontested she was physically impaired and that "[h]er ability to care for herself was plainly lessened due to her age and health problems"); *Farr v. Searles,* 180 Vt. 642, 910 A.2d 929, 930 (2006) (concluding plaintiff failed to prove she was a "vulnerable adult" for purposes of a civil suit as a "mere listing of physical ailments, which many people suffer, was not sufficient to establish that plaintiff was unable to protect herself from abuse, neglect, or exploitation").

In cases where the government has pursued a charge of abuse or exploitation of a vulnerable adult, courts have required the prosecution to present evidence that the victim was unable to perform daily activities related to self-care or protection as a result of a physical or mental infirmity, including advanced age. *See People v. Cline,* 276 Mich.App. 634, 741 N.W.2d 563 (2007) (finding evidence was sufficient to support conviction for first-degree vulnerable adult abuse where victim qualified as a vulnerable adult because she required some level of personal care as a result of blindness and diabetes and, thus, could not live independently); *Decker v. State,* 66 So.3d 654, 658 (Miss.2011) (recognizing that, in a case involving the prosecution for a violation of the Vulnerable Adults Act, the broad definition of "vulnerable adult" included "a person with completely normal mental capacity, but *whose ability to perform the normal activities of daily living is impaired because of a physical limitation,* such as blindness or the inability to walk" (emphasis added)); *State v. Stubbs,* 5 Neb.App. 38, 555 N.W.2d 55, 62 (1996) (vacating conviction for exploitation of a vulnerable adult where evidence that victim was physically and mentally aging did not establish that the victim had "substantial functional impairment which left him incapable of caring for himself or living independently"), *aff'd,* 252 Neb. 420, 562 N.W.2d 547 (1997). *See generally* James L. Buchwalter, Annotation, *Validity, Construction, and Application of*

*State Civil and Criminal Elder Abuse Laws,* 113 A.L.R. 5th 431 (2003 & Supp.2014) (analyzing state and federal cases involving civil suits and criminal prosecution for elder abuse); William D. Bremer, Annotation, *Vulnerability of Victim as Aggravating Factor under State Sentencing Guidelines,* 73 A.L.R. 5th 383 (1999 & Supp.2014) (analyzing state cases as to various aspects of vulnerability, such as age, that have been asserted in applying a state sentencing provision based on victim's vulnerability).

### 3. Determination of Whether Doe was a Vulnerable Adult

 Utilizing the foregoing definition, we must next assess whether the family court erred in concluding that Doe was a vulnerable adult. This assessment is problematic as the Act does not set forth the standard of proof necessary for this determination. Because the absence of a standard makes the analysis of this case difficult and also implicates constitutional due process issues, we must determine and enunciate the requisite standard of proof.

 Without question, an involuntary removal under the Act deprives a person of his liberty as well as property if the court orders a vulnerable adult to pay for the care received while in the custody of DSS. U.S. Const. amend. XIV, § 1 ("[N]or shall any state deprive any person of life, liberty, or property, without due process of law."); S.C. Const. art. I, § 3 ("[N]or shall any person be deprived of life, liberty, or property without due process of law.").

Accordingly, we conclude that a heightened standard of proof, i.e., clear and convincing evidence, is necessary under these circumstances. *See In re Knight,* 317 P.3d 1068 (Wash. Ct.App.2014) (holding that standard of proof for a vulnerable adult protection order opposed by the alleged vulnerable adult is clear, cogent, and convincing evidence because the protection order implicates the vulnerable adult's liberty and autonomy interests). Notably, our General Assembly has explicitly identified the clear and convincing standard of proof for the issuance of an involuntary commitment order involving a person who suffers from mental health issues. *See* S.C.Code Ann. § 44–17–580(A) (Supp.2013) (requiring, in a proceeding

for the involuntary commitment to a mental health facility, the court to find by *"clear and convincing evidence* that the person is mentally ill, needs involuntary treatment," and because of his condition lacks sufficient insight or capacity to make responsible decisions with respect to his treatment or there is a likelihood of serious harm to himself or others (emphasis added)).

▮▮▮ Applying a clear and convincing standard of proof, we find DSS failed to prove that Doe was a vulnerable adult. Significantly, counsel for DSS admitted the evidence was "scant" and there was only a "scintilla of evidence" to show that Doe qualified as a vulnerable adult under the terms of the Act. Furthermore, there is no evidence that Doe's advanced age substantially impaired her ability to adequately provide for her own care and protection. Specifically, there is no evidence of physical or mental infirmities that would prohibit Doe from living independently. To the contrary, the evaluating psychologist concluded Doe possessed a level of competency sufficient for her to function independently and she had no obvious physical limitations. Moreover, there is no evidence the unfavorable home condition that precipitated Doe's involuntary removal was causally related to her advanced age. Instead, the problems with Doe's home were dependent on the finances needed to repair the roof and turn on the water supply.[16] Although there is some evidence that Doe's home was in disarray, DSS offered no evidence attributing the lack of cleanliness to a deficiency in Doe's mental or physical condition. Accordingly, we find the family court erred in classifying Doe as a vulnerable adult.

Because DSS failed to prove the threshold determination that Doe was a vulnerable adult, we need not address the remaining prongs of the three-part test. Specifically, we need not determine whether Doe was at substantial risk of being neglected and whether protective services were necessary to

---

16. We are cognizant of the fact that poverty or the lack of adequate funds or resources may have a deleterious effect on an individual's ability to adequately provide for her care and protection; however, poverty alone is not sufficient to satisfy the definition of a vulnerable adult under the Act. Rather, there must be evidence of other factors that cause the deleterious effect.

protect Doe from the substantial risk of neglect. S.C.Code Ann. § 43–35–45(E) (Supp.2013).[17]

## IV. Conclusion

Although we believe the family court was well intentioned, we find that it erred in classifying Doe as a vulnerable adult under the Act. Specifically, there was no evidence that Doe's advanced age impaired her ability to adequately provide for her own care and protection. Without this threshold determination, the court erred in ordering Doe to remain in protective custody until the identified protective services were completed. However, because there may have been significant changes to Doe's physical and mental health and to the condition of Doe's home during the pendency of this appeal, we remand the case in order for the family court to conduct a review hearing to assess the current status of Doe's case.

Based on the foregoing, we reverse the order of the family court and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

HEARN and Acting Justice JAMES E. MOORE, concur.

KITTREDGE, J., dissenting in a separate opinion in which PLEICONES, J., concurs.

Justice KITTREDGE.

Because I do not construe the South Carolina Omnibus

---

17. In rejecting the majority's ultimate conclusion, the dissent takes issue with the majority's construction of the Act. Specifically, the dissent claims the majority "narrowly" construes the term "vulnerable adult" and, in turn, fails to address whether protective services were necessary to protect Doe from the substantial risk of neglect. The dissent, however, fails to appreciate the logical progression of the Act, which requires the Court to first determine whether DSS has established by clear and convincing evidence that Doe qualifies as a vulnerable adult pursuant to the statutory definition in the Act. In fact, the dissent makes only a cursory reference to the clear and convincing standard of proof necessary to support the involuntary removal of an adult from their home. Because Doe has asked this Court to interpret the Act, we cannot simply ignore the statutory language merely because there is evidence that Doe's living conditions were unfavorable at the time of her removal.

Adult Protection Act[18] (Act) narrowly, I respectfully dissent. The dispositive question is whether Jane Doe, now eighty-eight years of age, is a "vulnerable adult." By construing the term narrowly and finding Doe is not a vulnerable adult, the majority does "not address ... whether protective services were necessary to protect Doe from the substantial risk of neglect."

I begin with the definition of a vulnerable adult:

[A] person eighteen years of age or older who has a physical or mental condition which substantially impairs the person from adequately providing for his or her own care or protection. This includes a person who is impaired in the ability to adequately provide for the person's own care or protection because of the infirmities of aging including, but not limited to, organic brain damage, advanced age, and physical, mental, or emotional dysfunction. A resident of a facility is a vulnerable adult.

S.C.Code Ann. § 43–35–10(11) (Supp.2013). I believe the legislature defined the term broadly, as evidenced by the "including, but not limited to," language and the unmistakable purpose of the Act. I next observe that "neglect" is defined to include "the inability of a vulnerable adult, in the absence of a caretaker, to provide for his or her own health or safety which produces or could reasonably be expected to produce serious physical ... harm." *Id.* § 43–35–10(6) (Supp.2013). I also believe the circumstances and conditions that led to the taking of emergency protective custody (EPC), which establish neglect, are relevant to the vulnerable adult determination.

On July 31, 2012, law enforcement officers went to the home of Doe, then age 86. Doe, suffering from a heart condition, lived alone. Doe refused entry to the officers. The doors and windows to the home were barricaded. The officers noticed a hose running from a neighbor's home through a hole in the roof of Doe's home. This was Doe's only source of water, for water service had been stopped for nonpayment. The inside of the home was, according to the officers, "in an unsanitary and deplorable condition." There was mold present as well. The officers placed Doe in EPC, and she was transported to the hospital. Doe does not challenge the EPC.

---

18. S.C.Code Ann. §§ 43–35–5 to –595 (Supp.2013).

The experienced and excellent family court judge considered the totality of the circumstances, including the facts surrounding EPC, in finding Doe to be a vulnerable adult. The judge also carefully evaluated the entirety of testimony of Dr. Marc Harari. In addition to Dr. Harari's testimony cited by the majority, the judge referenced Dr. Harari in finding "that [Doe] would require medical monitoring . . . [and] [i]n addition, [Dr. Harari] suggested that any open treatment case, on a temporary basis, should contain a provision to ensure the necessary repairs are made to the household so that [Doe] could reside in a suitable living environment." In urging an affirmance of the family court order, the guardian *ad litem* (GAL) makes the common sense observation that "[w]ithout . . . running water, electricity, and adequate food it is hard to argue that any person would not be at risk of 'neglect' within the meaning of S.C.Code Ann. Section 43–35–10(6)." (Br. of GAL at 9).

My view of the case is in line with that of the family court judge, who acknowledged Doe's mental abilities and sought a prompt return of Doe to her home upon the completion of necessary repairs to make her home livable. I believe the vulnerable adult determination is supported by clear and convincing evidence, and I would affirm.