# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

The State, Respondent,

v.

Mack Adams Gaines, Appellant.

Appellate Case No. 2022-000567

---

Appeal From Oconee County
R. Scott Sprouse, Circuit Court Judge

---

Published Opinion No. 6142
Submitted February 3, 2026 – Filed March 25, 2026

---

## AFFIRMED

---

Senior Appellate Defender Kathrine Haggard Hudgins, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant
Attorney General Joshua Abraham Edwards, both of
Columbia, and Solicitor Micah Elijah Black, of
Anderson, all for Respondent.

---

**PER CURIAM:** Mack Gaines was convicted of abuse or neglect of a vulnerable
adult resulting in death and sentenced to twenty years in prison.[1]  Gaines appeals,
arguing the circuit court erred in failing to direct a verdict in his favor where the

---

[1] *See* S.C. Code Ann. § 43-35-85(F) (2015) ("A person who knowingly and
wilfully abuses or neglects a vulnerable adult resulting in death is guilty of a felony
and, upon conviction, must be imprisoned not more than thirty years.").

State failed to demonstrate he was a "caregiver" as defined by the Omnibus Adult Protection Act (the Act).[2]  We affirm.

**FACTS**

Gaines and his ninety-two-year-old mother (Victim) lived together in Victim's home.  While Gaines was at work on Friday, December 15, 2017, Victim fell in the home.  Gaines gave a video-recorded statement regarding the days following to David McMahan of the Oconee County Sheriff's Office.  According to the statement, Gaines found Victim on the floor when he returned home from work on Friday.  Victim was still on the floor on Saturday, when Gaines left the home to grocery shop and do laundry.  Also on Saturday, Gaines also asked Victim if she wanted help getting up; however, she declined.  After Victim complained of being cold, Gaines placed heaters near her.  Gaines also offered Victim food and water on Friday night and Saturday, which she declined.  Victim again refused food on Sunday.  Gaines left for work on Monday and returned.  Because Victim "stopped talking to him,"[3] Gaines called 911.

Emergency medical technicians (EMTs) arrived and found Victim lying on the floor with kerosene heaters on her at "full blast."  Victim was wearing seven long-sleeved shirts and a heavy jacket covering her otherwise bare lower body.  Based on Victim's condition, advanced life support paramedics were alerted.  Victim was unresponsive but taking shallow breaths.  Gaines reported to the EMTs that Victim had fallen on Friday, refused assistance, and remained on the floor until emergency services arrived Monday.

Michael Corbin of the advanced life support team described Victim as unresponsive, having a strong urine smell, wearing urine-soaked upper clothing, and having dried fecal matter on her bottom and dried saliva and mucus on her nose and mouth.  However, he opined Victim's "vital signs were not terribly bad."

Dr. Kevin Docyk, Victim's attending physician upon arrival at the hospital, described Victim as unkempt and nonverbal, covered in urine and feces, and suffering from numerous pressure sores and skin breakdown, particularly on the side she was found lying on.  After testing, Docyk found no acute orthopedic

---

[2] S.C. Code Ann. §§ 43-35-5 to -595 (2015 & Supp. 2025).
[3] Victim's responsiveness at this point is unclear, but Gaines said in his statement that he determined "it's not up to [her] now, it's up to me."

injuries. Victim was diagnosed with adult neglect, dehydration, elevated troponin,[4] rhabdomyolysis,[5] renal insufficiency, and sepsis. Docyk testified he spoke to Gaines and his girlfriend, one of whom indicated that Gaines was Victim's primary caregiver, which Docyk noted in Victim's chart.

Officer McMahan responded to the hospital based on a report of possible neglect. He interviewed Gaines on Tuesday, December 19, 2017, at the sheriff's office. Gaines admitted to McMahan that leaving Victim on the floor for numerous days constituted neglect.[6] However, Gaines denied he was Victim's caregiver, stating "Nah, I'm just the only one that lives there . . . . I'm the only son." McMahon testified Gaines told him he shared expenses with Victim, and Gaines admitted he ordinarily took her shopping and to do laundry.

Dr. Vijendra Singh attended to Victim once she was admitted to the hospital from the emergency room. Singh testified that on December 23, 2017, Victim's lower right leg developed limb ischemia.[7] Singh consulted with vascular surgeons, who deemed surgery to be too risky. Singh also consulted with Victim's niece, who ultimately declined surgery. Singh treated Victim from December 23 to December 27, using a blood thinner and pain management until Victim was transferred to hospice care. During this time, Singh noted Victim's lab work improved some, but her mental state did not.

Dr. Daniel Smith, a palliative care consultant, testified he was consulted on December 27, when Victim's diagnosis changed from rhabdomyolysis to a blockage in one of the main arteries to her leg. Smith testified Victim shook her head to indicate "no" when asked if she wanted to continue treatment in the hospital. Smith explained Victim developed gangrene, which led to sepsis. Victim died approximately one month after her fall.

---

[4] Docyk explained this is elevated for someone who has potentially suffered a heart attack, renal failure, or rhabdomyolysis.

[5] Docyk noted this is muscle breakdown, which can be caused by being on the ground for a long time or overworking in heat.

[6] McMahan testified he told Gaines, "We can't get past the fact that you left her [o]n the floor for four days. You know what that is, don't you?" Gaines replied, "[N]eglect."

[7] Singh defined this as a limb with a chance of being completely cut off from blood circulation, usually caused by blood clots.

Dr. Brett Woodard conducted an autopsy and opined that having been left on the floor for days "set the cascade in motion that ultimately caused [Victim's] death." He explained her death was caused by "[t]he death of [Victim's] extremity and formation of decubiti [or ulcers, which] allow germs into the body, and ultimately she developed pneumonia and organ failure."

After the State rested, Gaines moved for a directed verdict, arguing, *inter alia*, that he was not a caregiver. The State argued Gaines gave care to Victim, including covering her, offering food, and turning on heat when she was cold. The court denied the motion.

Gaines presented the testimony of Dr. Paul E. Thompson, Jr., who testified he was Victim's medical provider and had seen her in June of 2017. Although Victim suffered from hypertension, low thyroid function, and arthritis, she was mentally "very clear." Thompson described Victim's health as "stable," and noted Victim was extremely independent, very positive, and very stubborn.

The jury convicted Gaines, and the circuit court sentenced him to twenty years of imprisonment. This appeal follows.

## STANDARD OF REVIEW

An appellate court "review[s] the denial of a directed verdict motion in a criminal case under the any evidence standard of review." *State v. Cain*, 419 S.C. 24, 33, 795 S.E.2d 846, 851 (2017). "When reviewing a denial of a directed verdict, [the appellate court] views the evidence and all reasonable inferences in the light most favorable to the [S]tate. If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [c]ourt must find the case was properly submitted to the jury." *State v. Weston*, 367 S.C. 279, 292–93, 625 S.E.2d 641, 648 (2006).

## LAW/ANALYSIS

Gaines argues the circuit court erred in denying his motion for a directed verdict because the State failed to demonstrate Victim was a vulnerable adult and failed to demonstrate he was a caregiver. We disagree.

The Act provides the following: "A person who knowingly and wilfully abuses or neglects a vulnerable adult resulting in death is guilty of a felony . . . ." § 43-35-85(F). Neglect is defined as "the failure or omission of a caregiver to provide the

care, goods, or services necessary to maintain the health or safety of a vulnerable adult . . . ."  S.C. Code Ann. § 43-35-10(6) (2015).  A caregiver is defined as "a person who provides care to a vulnerable adult, with or without compensation, on a temporary or permanent or full or part-time basis and includes, but is not limited to, a relative, [and a] household member . . . ."  S.C. Code Ann. § 43-35-10(2) (2015).

Gaines first argues Victim was not a vulnerable adult prior to her fall.  A vulnerable adult is defined as follows:

> [A] person eighteen years of age or older who has a physical or mental condition which substantially impairs the person from adequately providing for his or her own care or protection.  This includes a person who is impaired in the ability to adequately provide for the person's own care or protection because of the infirmities of aging including, but not limited to, organic brain damage, advanced age, and physical, mental, or emotional dysfunction.

S.C. Code Ann. § 43-35-10(11) (2015).  Gaines relies on *Doe v. South Carolina Department of Social Services*, 407 S.C. 623, 638, 757 S.E.2d 712, 719–20 (2014), in which our supreme court found Doe was not a vulnerable adult despite her need to repair a roof and turn on her water because "there [was] no evidence that Doe's advanced age substantially impaired her ability to adequately provide for her own care and protection.   Specifically, there [was] no evidence of physical or mental infirmities that would prohibit Doe from living independently."  The court held that "for a person to be deemed a vulnerable adult under the Act[,] the person's physical or mental condition, including advanced age, must cause a diminished ability to adequately provide for self-care or protection."  *Id.* at 635, 757 S.E.2d at 718.

Here, even if we agree Victim was not a vulnerable adult prior to her fall, we find evidence sufficient to survive a motion for a directed verdict on the issue of whether she was a vulnerable adult after her fall.  The evidence suggests Victim was not capable of "providing for . . . her own care or protection" after her fall as indicated by her inability to get up or provide for her own nourishment or heat.  As defined by our supreme court in *Doe*, we find there was evidence that Victim's "physical or mental condition, including advanced age, . . . cause[d] a diminished ability to adequately provide for self-care or protection."  *See id.*  We find no error

by the circuit court in denying Gaines' motion for a directed verdict based on this element, which we hold was properly sent to the jury.

We next address Gaines' main contention, that he was not Victim's caregiver. As noted above, the statutory definition of a caregiver includes a person who provides care to a vulnerable adult with or without compensation. *See* § 43-35-10(2). Gaines argues that simply residing with Victim did not make him her caregiver nor did her fall make him her caregiver. According to Gaines, he was merely her roommate, sharing expenses, and even if he had a moral duty, he was under no legal duty to seek medical care for Victim after her fall.

The State argues that even if Gaines was not a caregiver before Victim's fall, he became a caregiver after the fall by offering her food, water, heat, and medical intervention. In addition, the State relies on Docyk's testimony that either Gaines or his girlfriend reported that Gaines was Victim's primary caregiver. Finally, the State relies on the following from Victim's interview:

> Interviewer: Are you her primary caregiver? Anybody else take care of her?
>
> Gaines: Nah, I'm just the only one that lives there. . . .
> I'm the only son.

We are mindful of the procedural posture of the issue before us—whether the circuit court erred in denying Gaines' motion for a directed verdict. When reviewing a denial of a directed verdict, this court must view the evidence and all reasonable inferences in the light most favorable to the State. *State v. Ladner*, 373 S.C. 103, 120, 644 S.E.2d 684, 693 (2007). If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, we must find the case was properly submitted to the jury. *State v. Pinckney*, 339 S.C. 346, 349, 529 S.E.2d 526, 527 (2000). We find the State presented sufficient evidence that Gaines was Victim's caretaker after her fall to submit the issue to the jury. The statute defines a caretaker to include one providing care to a vulnerable adult "with or without compensation," "full or part-time," and includes a "household member." § 43-35-10(2). As noted above, we find Victim was a vulnerable adult after her fall. Viewing the evidence in the light most favorable to the State, we also find Gaines provided care to her even if without compensation and as a mere roommate or household member. Accordingly, we find no error by the circuit court in denying Gaines' motion for a directed verdict. *See Law v. State*, 292 S.W.3d 277, 283–84 (Ark. 2009) (finding

where Law picked up his vulnerable mother, albeit "grudgingly and belatedly," to stay in his home, there was evidence to support the trial court's finding that he was a caregiver); *State v. Boyd*, 949 N.W.2d 540, 549–50 (Neb. Ct. App. 2020) (finding evidence that Boyd was her mother's caregiver where Boyd moved into her mother's house for a month to care for her "and to give her sister a break," then allowed her mother to lay on the floor for several days without eating or getting up).

**CONCLUSION**

For the foregoing reasons, the conviction and sentence are

**AFFIRMED.**[8]

**THOMAS, MCDONALD, and TURNER, JJ., concur.**

---

[8] We decide this case without oral argument pursuant to Rule 215, SCACR.